**ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED**

**No. 16-1014**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**Louisiana Public Service Commission,**

*Petitioner*

*vs.*

**Federal Energy Regulatory Commission,**

*Respondent*

_____

**ON PETITION FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION**

_____

**BRIEF FOR PETITIONER**

**Brandon Frey**
**Executive Counsel**
**Louisiana Public Service Commission**
**Galvez Building - 12th Floor**
**602 N. Fifth Street**
**Baton Rouge, Louisiana  70802**
**Telephone:  (225) 342-9888**

**Michael R. Fontham**
**Paul L. Zimmering**
**Noel J. Darce**
**Dana M. Shelton**
          **Of**
**STONE PIGMAN WALTHER
WITTMANN** L.L.C.
**546 Carondelet Street**
**New Orleans, Louisiana  70130**
**Telephone:  (504) 581-3200**

*Special Counsel to the Louisiana
Public Service Commission*

1205296v.1

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**(A) Parties**.  The following are the parties and intervenors in this Court:

>Louisiana Public Service Commission, petitioner.

>Federal Energy Regulatory Commission, respondent.

>Energy Services, Inc., intervenor.

>Arkansas Public Service Commission, intervenor.

The following additional parties intervened before FERC:

>Arkansas Electric Energy Consumers, Inc.

>City of New Orleans, Louisiana

>Louisiana Energy Users Group

>Mississippi Public Service Commission

>Occidental Chemical Corporation

>Union Electric Company d/b/a Ameren Missouri

**(B)    Rulings under review.**   The following decisions of the Federal Energy Regulatory Commission are under review:

(i)    *Louisiana Public Service Commission v. Entergy Services, Inc., et al., Opinion No. 519*, 139 F.E.R.C. ¶ 61,107 (May 7, 2012).  [J.A. ___].

(ii)    *Louisiana Public Service Commission v. Entergy Services, Inc., et al., Opinion No. 519-A*, 153 F.E.R.C. ¶ 61,188 (Nov. 19, 2015).  [J.A. ___].

(iii)    *Entergy Services, Inc., Opinion No. 523*, 142 F.E.R.C. ¶ 61,022 (Jan. 8, 2013).  [J.A. ___].

(iv)    *Entergy Services, Inc., Opinion No. 523-A*, 153 F.E.R.C. ¶ 61,184 (Nov. 19, 2015).  [J.A. ___].

1205296v.1

**(C)  Related Cases.**  This Court issued a decision on March 13, 2015 that denied a previous petition for review filed by the LPSC regarding the justness and reasonableness of including nuclear depreciation rates established by retail regulators in the annual Entergy "Bandwidth" Calculation, established to roughly equalize production cost disparities among the operating companies owned by Entergy Corp.  *La. Pub. Serv. Comm'n v. FERC*, 606 F. App'x 1 (D.C. Cir. 2015). The Court held that the LPSC raised its objection in the "wrong forum," the first annual bandwidth proceeding.  *Id.* at 4.  It determined that the underlying complaint case, in which *Opinion No. 519* and *519-A* were issued, is the "appropriate forum."  *Id.*  In *Louisiana Pub. Serv. Comm'n v. FERC*, 761 F.3d 540 (5th Cir. 2014), the United States Court of Appeals for the Fifth Circuit reached a similar conclusion on review of the second annual bandwidth proceeding.

1205296v.1

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

The Louisiana Public Service Commission is a political subdivision of the State of Louisiana.  No corporate disclosure is required.

1205296v.1

# GLOSSARY

| | |
|---|---|
| **ALJ** | A FERC administrative law judge. |
| **ANO** | Arkansas Nuclear One Units 1 and 2 |
| **APSC** | Arkansas Public Service Commission. |
| **Bandwidth** | The plus-or-minus 11 percent permissible deviations from System average under FERC's rulings. Entergy Companies outside the bandwidth pay or receive funds to bring them within its limits. |
| **Bandwidth Calculation** | The result of inputting data from sources specified in the Bandwidth Formula in an annual proceeding. |
| **Bandwidth Tariff or Bandwidth Formula** | A separate formula tariff, incorporated into Service Schedule MSS-3 of the System Agreement, which "roughly equalizes" production costs among the Companies. |
| **Companies** | The operating companies that are or were parties to the System Agreement and are wholly owned by Entergy. The Companies include Entergy Arkansas, Inc., Entergy Gulf States Louisiana, L.L.C., Entergy Louisiana, LLC, Entergy Mississippi, Inc., Entergy New Orleans, Inc., and Entergy Texas, Inc. |
| **Entergy** | Entergy Corporation, the holding company that owns 100% of the Companies. |
| **Entergy Arkansas** | Entergy Arkansas, Inc., an Entergy operating company regulated by the APSC. |
| **Entergy Louisiana** | Entergy Louisiana, LLC, an Entergy operating company regulated by the LPSC. |
| **Entergy Mississippi** | Entergy Mississippi, Inc., an Entergy Operating Company regulated by the MPSC. |
| **FERC** | Federal Energy Regulatory Commission, respondent. |

- iv -

1205296v.1

| | |
|---|---|
| **FERC Trial Staff or Trial Staff** | Lawyers and specialists in FERC's Office of Administrative Litigation who participated in the hearing. |
| **FPA** | Federal Power Act |
| **LPSC** | Louisiana Public Service Commission, petitioner. |
| **MPSC** | Mississippi Public Service Commission |
| **NRC** | Nuclear Regulatory Commission |
| **OATT** | Open Access Transmission Tariff |
| **Remedy** | The requirement that a tariff be implemented to ensure that the production costs of the Entergy Companies do not vary by more than 11 percent from the System average production costs. |
| **Remedy Case** | The proceeding in which FERC issued *Opinion No. 480* and created the +/- 11 percent Bandwidth Remedy. |
| **Service Schedule MSS-1** | A Service Schedule (tariff) in the System Agreement that equalizes the Companies' responsibility for System reserve generating capacity on the basis of the average 12-month coincident peak loads. |
| **Service Schedule MSS-2** | A Service Schedule in the System Agreement that equalizes the costs of the Companies' investments in bulk power transmission facilities. |
| **Service Schedule MSS-3** | A Service Schedule in the System Agreement that allocates excess energy among the Companies. The Bandwidth Tariff was included as an addition to Service Schedule MSS-3. |
| **Service Schedule MSS-4** | A Service Schedule in the System Agreement that sets the rates for power sales among the Companies. |
| **System** | The integrated electric facilities owned by the Entergy operating companies and the customer loads these Companies are required to serve. |

1205296v.1

| **System Agreement** | The System Agreement, as amended, among Entergy and its Companies, which operates as a FERC tariff and allocates costs among the Companies. |
| --- | --- |

1205296v.1

## TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT...................................iii

GLOSSARY.........................................................................................................iv

TABLE OF CONTENTS.................................................................................. vii

TABLE OF AUTHORITIES ..............................................................................ix

JURISDICTIONAL STATEMENT ......................................................................1

STATEMENT OF THE ISSUES..........................................................................2

STATEMENT OF THE CASE..............................................................................5

1.    *Overview.* .................................................................................................5

2.    *FERC enacts Remedy to ensure "rough equalization" of production
      costs.* ........................................................................................................7

3.    *FERC directs depreciation issue to annual bandwidth proceeding.*...............8

4.    *A FERC administrative law judge holds that Entergy's nuclear
      depreciation rates are unjust and unreasonable* .............................................9

5.    *A second ALJ disapproves Entergy's depreciation rates.* ............................14

6.    *FERC reverses course, directing the depreciation issue to a Section
      206 complaint proceeding.* ........................................................................14

7.    *The evidence in the complaint proceeding shows that Entergy's
      depreciation rates employ inconsistent methods and incorrect service
      lives, and conflict with FERC precedent and FERC's regulation*.................15

8.    *Initial Decision.* ..........................................................................................22

9.    *Opinion Nos. 519* and *519-A.* ......................................................................23

10.   *Opinion Nos. 523 and 523-A* ......................................................................26

SUMMARY OF THE ARGUMENT ..................................................................27

1205296v.1

STANDARD OF REVIEW ....................................................33

STANDING ...........................................................................34

ARGUMENT ..........................................................................34

I.    FERC'S RULINGS ARE ARBITRARY BECAUSE FERC FAILED
      TO CONFRONT THE EVIDENCE AND FAILED TO EXPLAIN
      HOW INCORRECT AND INCONSISTENT DATA MAY
      LAWFULLY BE USED IN A TARIFF DESIGNED TO COMPARE
      COSTS AND ELIMINATE UNDUE COST DIFFERENCES. ..................34

II.   FERC ARBITRARILY FAILED TO PROVIDE A REASONED
      BASIS FOR ITS DEPARTURE FROM PRECEDENT, POLICY
      AND ITS OWN DEPRECIATION REGULATION. ....................................43

III.  FERC'S DETERMINATION THAT RETAIL DEPRECIATION
      RATES MUST BE USED FOR THE BANDWIDTH TARIFF AND
      FERC ACCOUNTING CONSTITUTES AN UNLAWFUL
      SUBDELEGATION OF ITS RATEMAKING AND ACCOUNTING
      AUTHORITY. ....................................................................49

      A.    FERC Unlawfully Subdelegated the Ratemaking Authority that
            the FPA Vests Exclusively in FERC....................................51

      B.    FERC's Rulings Unlawfully Subdelegate Its Authority Over
            Depreciation Accounting....................................................56

IV.   FERC'S SUMMARY DENIAL OF RETROACTIVE RELIEF,
      AFTER FERC'S PROCEDURAL REVERSAL, ARBITRARILY
      DENIES A REMEDY TO THE LPSC FOR THE PERIOD PRIOR
      TO THE FILING OF THE COMPLAINT.....................................59

CONCLUSION ......................................................................61

RULE 32(a)(7)(b) CERTIFICATE OF COMPLIANCE ........................63

CERTIFICATE ......................................................................64

STATUTORY ADDENDUM ...................................................65

1205296v.1

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alabama Power Co. v. FERC*, 160 F.3d 7 (D.C. Cir. 1998) ............................10, 57

*Arkansas Power & Light Co. v. FPC*, 185 F.2d 751 (D.C. Cir. 1950)...................58

*Calvert Cliffs' Coordinating Comm., Inc. v U.S. Atomic Energy Comm'n*, 449 F.2d 1109 (D.C. Cir. 1971) ......................................................54

*Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289 (D.C. Cir. 2001) ...............................................................................................43

*Exxon Co., USA v. FERC*, 182 F.3d 30 (D.C. Cir. 1999)..................................34, 61

*FERC v. Triton Oil & Gas Corp.*, 750 F.2d 113 (D.C. Cir. 1984)...................33, 48

*\*Kentucky Utils. Co. v. FERC*, 760 F.2d 1321 (D.C. Cir. 1985).......................48, 58

*Kristin Brooks Hope Ctr. v. FCC*, 626 F.3d 586 (D. C. Cir. 2010)..................33, 42

*\*La. Pub. Serv. Comm'n v. FERC*, 184 F.3d 892 (D.C. Cir. 1999)............32, 33, 34, 47, 52

*La. Pub. Serv. Comm'n v. FERC*, 522 F.3d 378 (D.C. Cir. 2008)............................7

*La. Pub. Serv. Comm'n v. FERC*, 606 F. App'x. 1 (D.C. Cir. 2015) ................15, 50

*La. Pub. Serv. Comm'n v. FERC*, 761 F.3d 540 (5th Cir. 2014) ...............15, 31, 50, 55, 61

*McDonald v. Watt*, 653 F.2d 1035 (5th Cir. 1981)..........................................34, 61

*Mississippi Industries v. FERC*, 808 F.2d 1525 (D.C. Cir. 1987)..........................51

*Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354 (1988)...............................................................................................52

Authorities on which the LPSC primarily relies are designated with an asterisk.

1205296v.1

*Missouri Pub. Serv. Comm'n v. FERC*, 337 F.3d 1066 (D.C. Cir. 2003) ........................................................................54

*N. States Power Co. v. FPC*, 118 F.2d 141 (7th Cir. 1941)......................................33

*Nathan Katz Realty LLC v. NLRB*, 251 F.3d 981 (D.C. Cir. 2001).......................47

*PPL Wallingford Energy, LLC v. FERC*, 419 F.3d 1194 (D.C. Cir. 2005) ........................................................................33, 43

*\*Philadelphia Gas Works v. FERC*, 989 F.2d 1246 (D.C. Cir. 1993)..............30, 48

*Shell Oil Co. v. FERC*, 664 F.2d 79 (5th Cir. 1981)................................................48

*\*U.S. Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004) ...................31, 34, 50, 53, 54, 55

**Administrative Decisions**

*Arkansas Pub. Serv. Comm'n v. Entergy Servs., Inc.*, 119 F.E.R.C. ¶ 61,223 (2007)........................................................................9, 60

*\*Boston Edison Co.*, 59 F.E.R.C. ¶ 63,028 (1992)................................................11

*Entergy Servs., Inc.*, 120 F.E.R.C. ¶ 61,020 (2007) ................................................42

*Entergy Servs., Inc.*, 120 F.E.R.C. ¶ 61,094 (2007) ................................................9

*Entergy Servs., Inc.*, 127 F.E.R.C. ¶ 63,027 (2009) ................................................16

*Entergy Servs., Inc.*, 130 F.E.R.C. ¶ 61,170 (2010) ................................................60

*Entergy Servs., Inc.*, 132 F.E.R.C. ¶ 61,252 (2010) ........................................26, 46

*Entergy Servs., Inc., Initial Decision*, 124 F.E.R.C. ¶ 63,026 (2008) ..............12, 45

*Entergy Servs., Inc., Initial Decision*, 128 F.E.R.C. ¶ 63,015 (2009) ....................14

*Entergy Servs., Inc.* ("*Opinion No. 505*"), 130 F.E.R.C. ¶ 61,023 (2010)........................................................... 14, 25, 26, 32, 47, 60

Authorities on which the LPSC primarily relies are designated with an asterisk.

1205296v.1

*Entergy Servs., Inc.* ("*Opinion No. 514*"), 137 F.E.R.C. ¶ 61,029
    (2011)..................................................................................15, 17

*Entergy Servs., Inc.* ("*Opinion No. 523*"), 142 F.E.R.C. ¶ 61,022
    (2013)..................................................................39, 46, 53, 55, 59

*Entergy Servs., Inc.* ("*Opinion No. 523-A*"), 153 F.E.R.C. ¶ 61,184
    (2015)...................................................................6, 26, 27, 51, 56

*Entergy Servs., Inc.* ("*Opinion No. 526*"), 143 F.E.R.C. ¶ 61,116
    (2013)........................................................................7, 27, 53, 55

*La. Pub. Serv. Comm'n v. Entergy Corp.*, 124 F.E.R.C. ¶ 61,010
    (2008)......................................................................................9, 60

*La. Pub. Serv. Comm'n v. Entergy Servs., Inc.*, 117 F.E.R.C. ¶ 61,203
    (2006).........................................................................................7

*La. Pub. Serv. Comm'n v. Entergy Servs., Inc., Initial Decision*, 106
    F.E.R.C. ¶ 63,012 (2004).........................................................16

*La. Pub. Serv. Comm'n v. Entergy Servs., Inc.* ("*Opinion No. 480*"),
    111 F.E.R.C. ¶ 61,311 (2005)..................................................7, 8

*La. Pub. Serv. Comm'n v. Entergy Servs., Inc.* ("*Opinion No. 519*"),
    139 F.E.R.C. ¶ 61,107 (2012)...............................6, 23, 24, 25, 29,
                                  30, 32, 35, 36, 41,
                              45, 47, 53, 55, 59, 60

*La. Pub. Serv. Comm'n v. Entergy Servs., Inc.* ("*Opinion No. 519-A*"),
    153 F.E.R.C. ¶ 61,188 (2015)................................5, 25, 42, 43, 45

*La. Pub. Serv. Comm'n v. Sys. Energy Res., Inc.*, 124 F.E.R.C.
    ¶ 61,003 (2008).......................................................................44

*Middle South Energy, Inc.*, 31 F.E.R.C. ¶ 61,305 (1985).........................19

**Ohio Edison Co.*, 84 F.E.R.C. ¶ 61,157 (1998) ....................11, 24, 49, 58

*Order No. 141*, 12 Fed. Reg. 8461, 8503 (Dec. 19, 1947) .......................57

Authorities on which the LPSC primarily relies are designated with an asterisk.

*Order No. 618*, 92 F.E.R.C. ¶ 61,078 (2000) .............................3, 6, 10, 44, 46, 57

*Pub. Serv. Elec. & Gas Co.*, 124 F.E.R.C. ¶ 61,303 (2008).....................................9

*Westar Energy, Inc.*, 131 F.E.R.C. ¶ 61,183 (2010)................................................49

**Statutes and Regulations**

5 U.S.C. § 553 ..........................................................................................................55

5 U.S.C. § 706 ..........................................................................................................33

16 U.S.C. § 824d.......................................................................................1, 33, 51, 55

16 U.S.C. § 824e ...........................................................................................1, 33, 51

16 U.S.C. § 825 ...................................................................................................33, 57

16 U.S.C. § 825a...................................................................................33, 56, 57, 58

16 U.S.C. § 8251.........................................................................................................1, 34

18 C.F.R. Pt. 101, *Gen'l Instr. 22* .....................................3, 6, 10, 24, 28, 43, 57, 58

47 C.F.R. § 1.401 ......................................................................................................55

La. Const. art. IV, § 21...............................................................................................34

Authorities on which the LPSC primarily relies are designated with an asterisk.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction pursuant to Section 313(b) of the Federal Power Act. 16 U.S.C. § 825l(b). This proceeding was instituted by the timely filing of a petition for review of final Orders on Rehearing of the Federal Energy Regulatory Commission.

FERC had jurisdiction pursuant to the Federal Power Act. 16 U.S.C. §§ 824d, 824e. FERC issued *Opinion No. 519* on May 7, 2012 and *Opinion No. 523* on January 8, 2013. Petitions for rehearing were filed and on November 19, 2015, FERC issued Orders denying rehearing in both dockets. The Orders finally determined all issues raised in the Petition for Review. The Louisiana Public Service Commission filed its Petition for Review on January 15, 2016. 16 U.S.C. § 8251(b) authorizes the LPSC, a state regulatory agency, to petition for review of FERC Orders.

- 1 -

## STATEMENT OF THE ISSUES

1.     ***Failure to confront and address evidence of undue discrimination in cost allocation***.   In 2005, FERC adopted a tariff to correct unduly discriminatory production cost allocations on the Entergy Corp. ("Entergy") Electric System ("System").  Known as the "Bandwidth Formula" or "Bandwidth Tariff," the tariff is designed to ensure that the production costs of all the Companies remain within a +/- 11 percent bandwidth around System average costs.  To achieve its purpose, the tariff must utilize cost inputs that are determined in a consistent manner for each Entergy Company.

A primary cost input to the Bandwidth Formula is depreciation, which reflects the allocation of investment costs over the useful life of an asset.  Entergy has recorded depreciation based on depreciation rates approved by retail regulators in decisions issued decades ago.  The unrefuted evidence showed that the depreciation inputs in the Bandwidth Tariff reflect inconsistent methodologies and outdated assumptions that distort the calculation and prevent the cost allocations from remaining within the bandwidth.  In its decisions, FERC never addressed the evidence showing the unduly discriminatory distortion of the Bandwidth Calculation, or explain why the effects are permissible.  The issue is:

> In holding that the LPSC and FERC Trial Staff failed to prove that the use of inconsistent and outdated depreciation rates is unjust and unreasonable, did FERC arbitrarily fail to confront the evidence,

- 2 -

explain its conclusion, or link its finding to any "substantial evidence" in the record?

2.      ***Unexplained departure from regulation and precedent.***  FERC regulates the recording of depreciation, both for ratemaking and accounting purposes.  In *Order No. 618*, FERC exercised its statutory power to "ensure that electric utilities charge proper amounts of depreciation to expense in each financial reporting period."  *Order No. 618*, 92 F.E.R.C. ¶ 61,078, 2000 FERC LEXIS 1500, at *4 (2000).  FERC adopted a regulation to govern depreciation for ratemaking and accounting, which requires that depreciation expense be allocated in a "systematic and rational" manner over the "service life of the property."  18 C.F.R. Pt. 101, *Gen'l Instr. 22*.

The evidence showed that the retail-set depreciation rates Entergy used in the Bandwidth Tariff, for virtually every Entergy generating unit, do not comply with this standard.  FERC ruled, nevertheless, that its own regulation and ratemaking policy do not apply to the Bandwidth Tariff, without explanation.  The issue is:

Did FERC act arbitrarily in departing from its own regulation and precedents and permitting grossly inconsistent depreciation allowances to enter the Bandwidth Calculation, without explaining why the departure is consistent with a just and reasonable result?

3.      ***Unlawful abdication and delegation of authority***.  In prior rulings, FERC first determined that the Bandwidth Formula required it to exercise

- 3 -

authority over depreciation, but later reversed course and held the tariff required using retail depreciation rates. FERC directed challenges to the tariff to this case. In *Opinion Nos. 519* and *519-A*, FERC ruled that the tariff language amounts to a pre-approval of whatever depreciation is adopted by a retail regulator, both for FERC ratemaking and FERC accounting. FERC rescinded earlier rulings requiring Entergy to file for approval of changes in depreciation rates used in the Bandwidth Formula. Moreover, in *Opinion Nos. 523* and *523-A*, FERC disapproved a change in depreciation rates adopted by the Arkansas Public Service Commission ("APSC") and substituted its own for use in other wholesale tariffs, but ruled that the disapproved retail rates must be used for the Bandwidth Tariff and FERC accounting. The issue is:

> a. Do FERC's rulings unlawfully subdelegate its statutory authority over wholesale ratemaking for the Bandwidth Tariff and its statutory authority over depreciation accounting?
>
> b. Did FERC act arbitrarily in requiring different depreciation allowances in the Bandwidth Formula than in other wholesale tariffs?
>
> c. Did FERC unlawfully permit retail depreciation allowances to displace its own prescribed depreciation allowances for FERC accounting?

4. ***Denial of relief through procedural turnabout.*** FERC initially directed all justness and reasonableness issues to annual bandwidth proceedings. The LPSC prevailed with FERC ALJs in those cases on depreciation. FERC then ruled that the issue had to be raised in this complaint case, but in *Opinion No. 519*

- 4 -

ruled that the LPSC could not obtain retroactive relief even if it prevailed.  The issue is:

> Did FERC rule arbitrarily that the LPSC would not be entitled to relief prior to the filing of the complaint even if it prevailed, despite FERC's prior rulings directing the depreciation issue to annual bandwidth proceedings, which FERC reversed years later, when it required the filing of the complaint?

## STATEMENT OF THE CASE

1.    ***Overview.***  In a double-barreled repudiation of its responsibility to ensure that wholesale rates are just, reasonable and not unduly discriminatory, FERC ruled that depreciation rates set by retail regulators rather than FERC should be used for the Entergy Bandwidth Formula.  As the formula relies on data from FERC accounts, FERC also ruled that the retail-set depreciation should be used for FERC accounting.  FERC failed to acknowledge undisputed evidence submitted by the LPSC and the FERC Trial Staff, demonstrating that the depreciation rates reflect inconsistent methods and outdated service life assumptions, and distort the Bandwidth Calculation so that it cannot accomplish its purpose of achieving rough equalization among the Companies.  FERC held that the evidence failed to carry the burden of proof, without discussing the evidence or explaining why it was insufficient.  *La. Pub. Serv. Comm'n v. Entergy Servs., Inc.* ("*Opinion No. 519-A*"), 153 F.E.R.C. ¶ 61,188, ¶ 55 (2015); J.A. __.  In conclusory terms, FERC also held

that its own regulation, policy and precedents do not apply to the Bandwidth Formula.

Although the Federal Power Act ("FPA") provides FERC with plenary jurisdiction over utility accounting and depreciation, and FERC exercised its authority in *Order No. 618* by establishing a rule to govern depreciation accounting, FERC ruled that retail-set depreciation rates in conflict with the FERC regulation control Entergy's accounting. FERC's depreciation regulation requires that depreciation expense be allocated using a "systematic and rational" method over the "service life of the property." 18 C.F.R. Pt. 101, *Gen'l Instr. 22*. *Order No. 618* requires utilities to file for approval of any changes in depreciation rates entering FERC formula rates. 92 F.E.R.C. ¶ 61,078, 2000 FERC LEXIS 1500, at *14 n.25 (2000); J.A. __. FERC ruled that these requirements do not apply to the Bandwidth Formula, and the Bandwidth Formula determines the appropriate accounting. *La. Pub. Serv. Comm'n v. Entergy Servs., Inc.* ("*Opinion No. 519*"), 139 F.E.R.C. ¶ 61,107, ¶¶ 26, 113 (2012). [J.A. ___].

Additionally, in *Opinion Nos. 523* and *523-A*, and in another case involving Texas depreciation rates, FERC disapproved the retail depreciation rates and replaced them for wholesale purposes, but ruled that the retail rates still must be used in the Bandwidth Formula and FERC accounts. *Entergy Servs., Inc.* ("*Opinion No. 523-A*"), 153 F.E.R.C. ¶ 61,184, ¶ 22 (2015); [J.A. ___]; *Entergy*

- 6 -

*Servs., Inc.* ("*Opinion No. 526*"), 143 F.E.R.C. ¶ 61,116, ¶ 34 (2013). FERC ruled that no matter what depreciation expense retail regulators approve, the costs must be used for the Bandwidth Formula and FERC accounting.

        2.    **FERC enacts Remedy to ensure "rough equalization" of production costs.** Following precedent requiring that the costs of producing electricity on the Entergy Corp. ("Entergy") electric system be at least "roughly equal" among the Entergy operating companies ("Company" or "Companies"), FERC created a "bandwidth" remedy requiring that each Company's costs be within 11 percent of the Entergy System average. *See La. Pub. Serv. Comm'n v. Entergy Servs., Inc.* ("*Opinion No. 480*"), 111 F.E.R.C. ¶ 61,311 (2005); [J.A. ___]; *La. Pub. Serv. Comm'n v. FERC*, 522 F.3d 378 (D.C. Cir. 2008). FERC required Entergy in a Compliance Filing to include a "Bandwidth Formula" in the Entergy System Agreement, which is a FERC tariff that provides for central planning of generating units and the allocation of the associated costs.

        To comply with *Opinion No. 480*, Entergy filed a formula tariff, which specifies the sources of data to be used in calculating the production costs of each Company and provides for payments and receipts to bring them within the bandwidth. *See La. Pub. Serv. Comm'n v. Entergy Servs., Inc.*, 117 F.E.R.C. ¶ 61,203 (2006), *on reh'g*, 119 F.E.R.C. ¶ 61,095 (2007); LC-3. [J.A. ___]. The language provides for using depreciation expense recorded in the applicable FERC

- 7 -

account, but adds:  "as approved by Retail Regulators, *unless the jurisdiction for determining the depreciation . . . rate is vested in the FERC under otherwise applicable law*."  [LC-3 at 11 ("NDE" variable) (emphasis added); J.A. __].  The related accumulated depreciation provision calls for using the amount in the applicable FERC account and adds:  "approved by the retail regulator having jurisdiction over the Company, *unless the FERC determines otherwise*."  [*Id.* at 9 ("NAD" variable) (emphasis added); J.A. __].

When Entergy filed the tariff in 2006, it did not populate the formula with data.  Thus, the amounts of depreciation that would enter the formula were not provided.  In the underlying proceeding, Entergy presented summary calculations of production costs for 1983-2002, but the depreciation components never became an issue.  *Opinion No. 480*, ¶ 31; J.A. __.  Nor were the methodologies used to determine depreciation for each Company examined.  The impact of the retail-set depreciation first became evident when the formula was populated with data in the first annual bandwidth proceeding, which occurred in 2007.

3. ***FERC directs depreciation issue to annual bandwidth proceeding.***  Entergy filed the Bandwidth Tariff as a formula rate, which specifies required sources of data but does not contain specific cost inputs.  The formula remains constant, but the cost inputs change periodically and change the stated

- 8 -

rates. FERC cannot know the inputs when it approves the formula; therefore, FERC policy provides that the inputs are always subject to review for justness and reasonableness. *Pub. Serv. Elec. & Gas Co.*, 124 F.E.R.C. ¶ 61,303, ¶ 17 (2008).

After approving the Bandwidth Formula, FERC made clear that it would review the reasonableness of all cost inputs to the formula in annual bandwidth proceedings. It dismissed a complaint filed by the APSC, holding that justness and reasonableness challenges should be raised in bandwidth proceedings. *Arkansas Pub. Serv. Comm'n v. Entergy Servs., Inc.*, 119 F.E.R.C. ¶ 61,223 (2007); J.A. ___. In its Order setting the first bandwidth proceeding for hearing, FERC said that its determination would be based on the "reasonableness" of the cost inputs. *Entergy Servs., Inc.*, 120 F.E.R.C. ¶ 61,094, ¶¶ 11, 16 (2007); J.A. ___.

Despite FERC's rulings, Entergy and the APSC contended that the reasonableness of cost inputs could not be reviewed in bandwidth proceedings. Therefore, the LPSC filed a complaint on depreciation and other cost issues. FERC dismissed the complaint on those issues, holding that the issues were to be litigated in the first bandwidth proceeding. *La. Pub. Serv. Comm'n v. Entergy Corp.,* 124 F.E.R.C. ¶ 61,010, ¶ 27 (2008); J.A. ___.

      4. ***A FERC administrative law judge holds that Entergy's nuclear depreciation rates are unjust and unreasonable.*** The inconsistent nuclear service lives used by Entergy to estimate the amount of depreciation cost for three

1205296v.1

of the Companies was the primary issue in the first bandwidth proceeding. Depreciation expense is a large component of production costs. To the extent the estimates are based on inconsistent methodologies, they distort the allocation of production costs among the Companies. [LC-1 (LPSC witness Kollen) at 18-21; J.A. __]. The Bandwidth Formula is designed to bring the Companies to within a precise +/- 11 percent bandwidth; it cannot do so if estimates of costs are inaccurate. [*Id.*].

FERC has always regulated the depreciation expense allocations that enter wholesale rates. *Alabama Power Co. v. FERC*, 160 F.3d 7, 8 (D.C. Cir. 1998). FERC has regulated "depreciation accounting by utilities" as part of its power "to regulate the rates utilities can charge to consumers." *Id.* at 8. Prior to 1998, FERC had not regulated depreciation accounting where it was "not implicated in a ratemaking proceeding," although Congress gave it that authority in Section 302 of the Federal Power Act. *Id.* The Court in *Alabama Power* held that the statute was not self-executing, but in response, FERC adopted a rule to govern depreciation accounting. *Order No. 618*, 92 F.E.R.C. ¶ 61,078 (2000). FERC thus now exercises jurisdiction over depreciation for ratemaking and accounting.

The accounting rule requires that utilities depreciate their assets in a "systematic and rational manner" over the "service life of the property." 18 C.F.R. Pt. 101, *Gen'l Instr. 22(A)*. The standard is the same for FERC ratemaking.

- 10 -

*Boston Edison Co.*, 59 F.E.R.C. ¶ 63,028, at 65,238 (1992). To the extent state-approved rates differ from the FERC standard, FERC has required that FERC-compliant costs be recorded and the differences stated separately as regulatory assets or liabilities. *Ohio Edison Co.*, 84 F.E.R.C. ¶ 61,157 (1998).

The Nuclear Regulation Commission ("NRC") extended the license lives of Entergy Arkansas's Nuclear One ("ANO") Units 1 and 2 from 40 to 60 years prior to 2006, the first test year for the Bandwidth Formula. If Entergy Arkansas had accurately estimated depreciation using the correct service lives, the change would have reduced its production costs in the Bandwidth Calculation. If it did not recognize the service life changes, Entergy Arkansas could effectively export excess depreciation expense to other Companies through the Bandwidth Tariff. [LC-1 (LPSC witness Kollen) at 25; J.A. ___].

Entergy performed an analysis in 2006 of the bandwidth effect of not recognizing the changes in service lives until 2013, when Entergy Arkansas planned to withdraw from the System Agreement. Because Entergy Arkansas could export hundreds of millions of dollars in the years in which it would be subject to the bandwidth, Entergy chose not to file for a change in depreciation rates with the APSC. [*Id.* at 21-25; J.A. ___]. Entergy's study showed "that [Entergy Arkansas] could transfer its capital costs to the other operating companies by leaving its depreciation rates at incorrect, excessive levels through 2013 . . . ."

1205296v.1

[*Id.* at 23-24; J.A. __].   Entergy explained its rationale to the APSC and that agency did not raise the issue in the Company's 2006 retail rate case.  [*Id.* at 24; J.A. __].

The *Initial Decision* in the first bandwidth proceeding made extensive findings that the nuclear depreciation lives, and particularly those previously approved by the APSC, were unjust and unreasonable.  124 F.E.R.C. ¶ 63,026 (2008). [J.A. ___].  The judge relied on testimony from the FERC Trial Staff and LPSC, and FERC precedent.  The Staff depreciation expert testified that the depreciation rates should be determined consistently.  *Id.*, ¶ 444; J.A. ___.  Specifically, "units ANO 1 and ANO 2 should reflect the approved license extension. . . ."  *Id.*  Another Staff witness explained the potentially discriminatory effects of inconsistent methodologies employed by retail regulators.  *Id.*, ¶ 455; J.A. ___.

The *Initial Decision* found that the depreciation rates violated FERC precedent requiring the use of NRC license lives in establishing depreciation for nuclear units.  *Id.*, ¶¶ 447-48 (citing *Boston Edison Co.*, 52 F.E.R.C. ¶ 61,010 (1990)); J.A. __.  It ruled that "only by following the cited precedent and adopting the FERC Staff position, will there ever be any consistency in establishing appropriate expenses for nuclear depreciation and decommissioning, for purposes of determining the Bandwidth calculations."  *Id.*, ¶ 449; J.A. ___.  The judge

- 12 -

determined that the "nuclear depreciation and decommissioning-related costs . . . are not just and reasonable and are also discriminatory and preferential." *Id.*, ¶ 695; J.A. ___.  He explained:

> The acceleration of EAI's nuclear depreciation is unjust and discriminatory because it moves artificial depreciation costs into the period in which EAI expects the Bandwidth to exist and artificially lowers depreciation costs thereafter.

*Id.*, ¶ 694; J.A. ___.  Relying on the testimony of a former Chief Accountant at FERC, the *Initial Decision* also found that the nuclear depreciation rates violate FERC accounting requirements.  *Id.*, ¶¶ 469-75; J.A. ___.

The *Initial Decision* concluded that "[w]hile it can easily be said that the APSC's failure to readjust the depreciation expenses when the NRC granted the license extension does not comport to any reasonable accounting standard or established FERC precedent, nor did any party present any evidence as to the reasoning for maintaining a forty-year depreciation life, the APSC can readily for retail rate purposes establish whatever rate it deems appropriate."  *Id.*, ¶ 483; J.A. ___.  The judge determined, however, that FERC has final say over the depreciation rates used in wholesale rates.  *Id.*, ¶ 484; J.A. ___.  He required Entergy to recalculate the nuclear depreciation expenses consistent with FERC policy and precedent for that purpose.  *Id.*, ¶ 492; J.A. ___.

1205296v.1

5.    ***A second ALJ disapproves Entergy's depreciation rates.***   In the second bandwidth proceeding, litigated prior to FERC's ruling in the first case, the outdated service life assumptions for almost all the generating units in the retail depreciation rates were at issue.  The judge in that case ruled that the depreciation rates were based on studies performed in the 1986-1998 period and were outdated, indicating that the rates may be unjust and unreasonable.  *Initial Decision*, 128 F.E.R.C. ¶ 63,015, ¶ 213 (2009); J.A. ___.  He accepted Entergy's commitment to file new studies and held they would provide the basis for establishing depreciation for the Bandwidth Formula.  *Id.*, ¶ 228; J.A. ___.  Entergy subsequently prepared comprehensive depreciation studies, which the LPSC relied on in this case.

6.    ***FERC reverses course, directing the depreciation issue to a Section 206 complaint proceeding.***   FERC reversed the judge's ruling in the first bandwidth proceeding, although it took "no issue" with his basic finding.  *Entergy Servs., Inc.* ("*Opinion No. 505*"), 130 F.E.R.C. ¶ 61,023, ¶ 173 (2010).  [J.A. __].  Reversing its prior procedural holdings, FERC ruled that the bandwidth proceeding was *not* the proper proceeding to determine the issue.  FERC said that equitable treatment for ratepayers "is a matter solely for a future section 205 or 206 proceeding, not this bandwidth remedy proceeding."  *Id.* at ¶ 173.  The ruling was affirmed by this Court, which held that the "appropriate forum" for the

- 14 -

depreciation issue was this complaint case. *La. Pub. Serv. Comm'n v. FERC*, 606 F. App'x. 1, 4 (D.C. Cir. 2015).

FERC went further in the second bandwidth proceeding, reversing its prior interpretation that the "unless" language in the tariff provided it with authority over depreciation, and instead finding that the "ambiguous" language precluded FERC from asserting its own jurisdiction. *Entergy Servs., Inc.,* ("*Opinion No. 514*"), 137 F.E.R.C. ¶ 61,029, ¶ 54 (2011). [J.A. ___]. FERC ruled that a party wishing to challenge the cost inputs would have to seek a change in the formula: "If any entity wants to change the depreciation rates used in that formula, it must seek a modification to the bandwidth formula in a section 205 or 206 filing." *Id.*, ¶ 52. [J.A. ___]. That ruling was affirmed by the Fifth Circuit. *La. Pub. Serv. Comm'n v. FERC*, 761 F.3d 540, 552 (5th Cir. 2014).

7. ***The evidence in the complaint proceeding shows that Entergy's depreciation rates employ inconsistent methods and incorrect service lives, and conflict with FERC precedent and FERC's regulation.*** Both the LPSC and FERC Trial Staff presented evidence establishing that the use of retail-set depreciation rates in the Bandwidth Formula is unjust and unreasonable. First, the use of inconsistent depreciation methodologies produces inconsistent cost allowances entering the formula, which prevents an accurate production cost comparison. Second, the use of rates reflecting grossly erroneous service lives

- 15 -

produces inflated or deflated depreciation allowances, which distort the calculation and prevent it from accomplishing its purpose.

Because the Bandwidth Formula is designed to compare the production costs of each Company and adjust them to within the +/- 11 percent bandwidth, the determination of an allowance like depreciation for the Companies must produce comparable results. In the proceeding in which FERC created the Remedy, the *Initial Decision* devoted a section to determining "How Should Production Costs . . . Be Stated Consistently Among the Operating Companies." *Initial Decision*, 106 F.E.R.C. ¶ 63,012, pt. III (2004); J.A. ___. The judge determined that the only state regulatory adjustment that would be reflected was a Louisiana imprudence disallowance that was not contested at FERC by any party. *Id.*, ¶¶ 94-97; J.A. ____.

On other issues, FERC has recognized the need for a consistent statement of production costs. The Bandwidth Formula reflects per-books costs rather than those collected in retail rates and includes provisions ensuring that timing differences in cost recognition in retail jurisdictions are eliminated. [LC-3 at 8 n.1 (elimination of Grand Gulf accelerated recovery for Entergy Arkansas and Entergy Mississippi, Inc. ("Entergy Mississippi")); J.A. ___]; *Entergy Servs., Inc.*, 127 F.E.R.C. ¶ 63,027, ¶ 12 (2009) (eliminating effect of retail deferral of purchased power costs). Rather than using the return on equity in each retail

- 16 -

jurisdiction, the tariff applies *the average* in computing each Company's return requirement.   [LC-3 at 10 (variable "c")].   FERC has ruled that "[f]or the bandwidth formula what is relevant are the amounts paid by Entergy Louisiana . . . not the amounts Entergy Louisiana ultimately recovers from its retail ratepayers." *Opinion No. 514*, 137 F.E.R.C. ¶ 61,029, ¶ 90 (2011).

Both the FERC Trial Staff and the LPSC submitted evidence demonstrating that the use of retail-set depreciation rates in the Bandwidth Formula is unjust and unreasonable.   Staff witness John Sammon testified that "retail-regulator-determined depreciation rates have reflected conflicting depreciation rate policy choices and have been contrary to FERC depreciation precedents" and provide "an incentive for a retail regulator to overstate its Operating Company's depreciation rates in order to obtain an advantage" in the bandwidth.   [S-1 at 22; J.A. ___].   He concluded that "[o]nly FERC can make certain . . . that these inputs are calculated on a consistent basis for all Operating Companies." [*Id.* at 23; J.A. ___].

LPSC witness Lane Kollen testified that the retail depreciation rates "were developed based on depreciation studies performed many years ago." [LC-1 at 14; J.A. ___].   Using Entergy's 2008 depreciation studies, which included service life determinations, he showed that the retail rates used outdated service life assumptions that were erroneous for virtually all the Entergy units.  [*Id.* at 14-16].

- 17 -

He testified that the depreciation rates "were not developed on a consistent basis," but were "developed at different dates, based on analyses and recommendations by different consultants using different methodologies and adjusted by the different state regulatory commissions for various reasons." [*Id.* at 18; J.A. ___].

Entergy's studies established that the retail depreciation rates for 74 generating units were based on estimated retirement dates that were incorrect as of 2008. [*Compare, e.g.*, LC-4 at 24-27, *with* LC-19 at 36-37; LC-5 at 25-26, *with* LC-20 at 35; LC-6 at 27-31, *with* LC-21 at 35-36, *and* LC-14 at 8; J.A. ___, ___, ___]. The estimated retirement dates used for the existing depreciation rates were based on studies and regulatory orders issued primarily in the 1980s and 1990s. Twenty-eight of 75 Entergy generating units were projected to have retired by 2008 in the studies used to set retail depreciation rates, but were still operating when the new studies were performed in 2008.

The Entergy studies also showed that, using Entergy's preferred methodology, the production depreciation rates for each of the Companies were inaccurate in substantial amounts annually. [S-7 at 1 (columns "2008 Expense" vs. "Entergy Proposed"); J.A. ___]. For instance, the Entergy Arkansas depreciation expense was $15 million too high on a comparable basis relative to the 2008 study. [*See* LC-19 at 56-57; S-7 at 1 (excluding newly-acquired Ouachita unit from 2008

- 18 -

study); J.A. __].  For other Companies, the depreciation expense deviated by tens of millions of dollars from the updated amounts in the studies.  [*Id.*].

An exhibit sponsored by Trial Staff witness Pewterbaugh shows the results after conforming the 2008 Entergy studies to FERC requirements.  [S-7 ("Staff Recommended" and "CWK Recommended")].  The primary adjustment used the Average Life Group procedure, in accordance with FERC precedent, rather than Entergy's preferred Equal Life Group procedure.  [LC-25 (LPSC witness King) at 8; S-5 (Staff witness Pewterbaugh) at 9; J.A. __, __]; *Middle South Energy, Inc.*, 31 F.E.R.C. ¶ 61,305 at 61,658 (1985).  After adjustment, Entergy's depreciation rates again deviated in huge amounts from the depreciation rates recommended by the Staff and LPSC.  As an example, compared to the Staff recommendation, Entergy Arkansas's  depreciation expense in 2008 was $39.4 million too high.  [S-7 (columns "2008 Expense" versus "Staff Recommended"); J.A. __].  Entergy Louisiana's depreciation expense was $47 million too low.  [*Id.*].

The LPSC presented unrefuted testimony showing why the use of incorrect depreciation rates in the Bandwidth Calculation is unjust and unreasonable.  The recognition of depreciation as a production "cost" is a matter of determining the appropriate timing of the recovery of investment.  [LC-1 (Kollen) at 22; J.A. __].  On a retail basis, setting depreciation expense is a matter of "pay me now or pay me later," but the entire investment expense must be recovered in

1205296v.1

the long run, absent a Bandwidth Formula. [*Id.*]. Thus, since the utilities or consumers will be made whole in the long run, state commissions may choose slower or faster depreciation methods to offset other rate elements in retail rates. A change in depreciation rates can change rates to consumers without affecting a utility's book earnings, so depreciation can be a useful tool to moderate the effect of rate changes. But the inclusion of these state-set inputs distorts the Bandwidth Calculation and produces undue discrimination.

Mr. Kollen explained that the depreciation expense of each Company affects the Company's total production costs. These costs are then compared to the Company's allocated share of System production costs for the purpose of determining bandwidth payments and receipts. [*Id.* at 13; J.A. __]. To the extent that the depreciation expense is calculated in an inconsistent fashion, the incorrect depreciation rates render the rates unjust and unreasonable. Mr. Kollen explained: "Consequently, if one operating company's depreciation expense is excessive, or computed on a more accelerated basis than that of the other operating companies, then a portion of that excessive depreciation expense is "exported" to the other operating companies." [*Id.* at 14; J.A. __].

The importance of ensuring that the depreciation inputs reflect current and accurate assumptions is magnified by the fact that the Bandwidth Tariff will not be in effect permanently for all the Companies. Mr. Kollen stated:

> This problem is compounded by the planned withdrawals of [Entergy Arkansas] and [Entergy Mississippi] from the System Agreement in 2013 and 2015, respectively. Consequently, the bandwidth tariff may not be in effect for the long run even if the depreciation differences could be mitigated simply by the passage of long periods of time. . . .

[*Id.* at 23].  This evidence was unrefuted.

Entergy presented the testimony of Brian W. Caldwell to address depreciation issues.  But Mr. Caldwell made it clear that he did not support the reasonableness of Entergy's existing depreciation rates for ratemaking or accounting.  [Tr. 489-91; J.A. __].  Further, Mr. Caldwell stated that he did not attempt to support the nuclear service life assumptions reflected in the depreciation rates.  [*Id.*].  Entergy witness Jay A. Lewis also testified that he was not claiming the existing rates could be supported based on estimated service lives, or that they systematically allocate asset investments over the estimated service lives.  [Tr. 574-75; J.A. __].  Entergy presented no testimony to support the existing depreciation rates based on depreciation standards.

APSC witness Keith Berry agreed at the hearing that he did not contend that the current depreciation rates allocate the investment in generating assets "in a systematic and rational manner over the currently estimated service lives of those assets."  [Tr. 775; J.A. __].  He also agreed that he did "not know whether those depreciation rates would be found acceptable by a person with

1205296v.1

expertise in depreciation." [Tr. 776; J.A. __].  The APSC did not try to support the depreciation rates using depreciation standards.

8.    ***Initial Decision.***    The *Initial Decision* conceded that the depreciation rates conflict with FERC policy and its regulation, but held that the conflicts did not matter.  The ALJ held that for the Bandwidth Tariff, whatever Entergy records is "per se" just and reasonable.  [I.D., ¶ 27; J.A. __].  She determined summarily that the use of incorrect service lives in computing depreciation is insufficient to establish that the tariff is unjust and unreasonable.  [I.D., ¶ 29; J.A. __].  Similarly, she held that the use of inconsistent methodologies does not matter.  [I.D., ¶ 30; J.A. __].  The ALJ summarily ruled that deviations from FERC policy and precedent are irrelevant for the Bandwidth Formula.  [I.D., ¶ 28; J.A. __].

The ALJ held that FERC may permit retail regulators to establish depreciation for the Bandwidth Formula.  [I.D., ¶¶ 25-26; J.A. __].  She acknowledged that there was evidence of incorrect depreciation rates and changed circumstances, but deemed it irrelevant.  The ALJ found:

> [N]o participant alleges that any service life assumptions were arbitrary or erroneous when originally adopted. Rather, the LPSC based the Complaint on circumstances that changed over time, and that created service life assumptions that are different today than when the depreciation rates were originally adopted.  No statute, regulation, or other rule requires Entergy to file new

depreciation rates with adjusted depreciation estimates to
account for the passage of time. . . .

[I.D., ¶ 29; J.A. __].  The ALJ thus effectively ruled that depreciation rates, once

established by retail regulators, cannot be changed at FERC for the Bandwidth

Calculation regardless of the evidence or a change of circumstances.

       9.   **_Opinion Nos. 519_ and _519-A._**   In upholding the _Initial_

_Decision_, FERC essentially ruled that the Bandwidth Tariff is different from all

other FERC tariffs, without explaining the difference or why it made grossly

incorrect depreciation inputs irrelevant.  Thus, FERC held it was appropriate to

approve the inputs without "assessing, in general or in the abstract, whether the

retail depreciation rate information used in the bandwidth formula is consistent

with Commission precedent . . . ."  _Opinion No. 519_, ¶ 42; J.A. __.  FERC found

that its policy to use license lives approved by the NRC for nuclear depreciation "is

not controlling in the context of the bandwidth formula remedy," without saying

why.  _Id._, ¶ 112.  It ruled that "the Commission's ratemaking practices should not

apply in all instances," without any explanation.  _Id._  FERC cited the prudence

disallowance approved by the ALJ in the initial Remedy case, without explaining

how a cost all parties agreed was imprudent could be comparable to depreciation

allowances that conflict with FERC policy.  _Id._

       The Bandwidth Formula relies primarily on FERC accounting data for

cost inputs.  FERC regulations require that utility accounting data conform to the

1205296v.1

Uniform System of Accounts ("USOA"), which includes an instruction requiring that depreciation expense be allocated using a "systematic and rational" method over the "service life of the property." 18 C.F.R. Pt. 101, *Gen'l Instr. 22*. In *Ohio Edison Co.*, 84 F.E.R.C. ¶ 61,157, at 61,862 (1988), FERC ruled that FERC-approved depreciation rates rather than retail rates must be used for FERC accounting.

But here, FERC determined that the "Retail Regulators" language in the Bandwidth Formula displaces the accounting requirement for Entergy: "[T]o the extent the bandwidth depreciation variables require the use of depreciation rates approved by retail regulators, those depreciation rates *are* the Commission-approved depreciation rate for bandwidth formula purposes, and the resulting amount of depreciation expense is appropriately recorded by the Entergy Operating Companies in the FERC depreciation accounts in their FERC Form 1s, consistent with *Ohio Edison*." *Opinion No. 519*, ¶ 113; J.A. __.

FERC's discussion of the impact of the inconsistent and inaccurate depreciation rates in the Bandwidth Calculation was limited to a single paragraph. Without discussing the evidence, FERC said that the LPSC and Trial Staff failed to prove their case. *Opinion No. 519*, ¶ 122. FERC *never* explained how the use of inconsistent allowances, with the distorting effect on the Bandwidth Calculation, could be just and reasonable.

1205296v.1

In *Order No. 618*, FERC required that utilities file for approval of all depreciation changes entering FERC formula rates. *Opinion No. 519*, ¶ 11 n.21; J.A. __. FERC in both the first and second bandwidth proceedings required that Entergy file for approval of changes in depreciation rates entering the Bandwidth Formula. *E.g.*, *Opinion No. 505*, 130 F.E.R.C. ¶ 61,023, ¶ 172 n.205 (2010). But in *Opinion No. 519*, FERC retracted this requirement. It said: "[I]t is unnecessary for Entergy to make a section 205 filing in order to seek approval to include revised depreciation rates adopted by any of its retail regulators in the bandwidth formula (*i.e.,* the Commission's policy on changes in depreciation in formula rates established in Order No. 618 does not apply to the bandwidth formula) and the Commission reverses statements to the contrary . . . ." *Opinion No. 519*, ¶ 26; J.A. __.

In *Opinion No. 519-A*, FERC reaffirmed its holding. It rejected the argument that the calculation should be uniform. *Opinion No. 519-A*, ¶ 19; J.A. __. FERC again attempted to distinguish the Bandwidth Formula from all other FERC rates, without explaining why the purported distinction makes a difference. *Id.*, ¶ 28; J.A. __. Despite the evidence that almost all of the service lives were incorrect, FERC ruled that the LPSC failed to show the rates did not allocate "the cost of property over its useful life in a manner that was not 'systematic and rational.'" *Id.*, ¶ 29; J.A. __.

1205296v.1

FERC said that its *Boston Edison* policy to rely on NRC license lives did not apply because it "has not [been] codified." *Id.*, ¶ 30; J.A. __.  It ruled that *Ohio Edison* was inapplicable because "the Commission effectively adopted those depreciation rates approved by retail regulators as the Commission-approved depreciation rates," for the Bandwidth Formula and accounting.  *Id.*, ¶ 31; J.A. __.  FERC acknowledged that the depreciation rates are different "than they would have been if calculated under Commission policies," but held that was insufficient to justify changing the formula.  *Id.*, ¶ 55; J.A. __.

10.    ***Opinion Nos. 523 and 523-A***.   In its prior rulings directing depreciation issues to a complaint case, FERC reaffirmed that Entergy was subject to *Order No. 618* and would be required to file for FERC approval of any changes in depreciation rates entering the Bandwidth Formula.  *E.g., Opinion No. 505*, ¶ 173 n.205; J.A. ___.  Before FERC rescinded that directive, the APSC approved new depreciation rates for Entergy Arkansas in 2010, and Entergy filed for approval of the changes.  FERC set the case for hearing to determine whether the new rates were just and reasonable.  *Entergy Servs., Inc.*, 132 F.E.R.C. ¶ 61,252, ¶ 17 (2010).

In *Opinion Nos. 523* and *523-A*, FERC affirmed an ALJ decision that disapproved an assumption that had the effect of shortening the service life of the ANO 1 nuclear unit.  *Opinion No. 523-A*, ¶ 48; J.A. ___.  With that revision, FERC

- 26 -

1205296v.1

approved the Entergy Arkansas depreciation rates as just and reasonable. FERC required that the FERC-approved rates be used in Service Schedule MSS-1 and MSS-4 of the System Agreement, but held that the *disapproved* rates should be used in the Bandwidth Formula. *Id.*, ¶ 33; J.A. ___. FERC ruled that retail-regulator-approved depreciation rates must be used, even if FERC finds they are unjust and unreasonable for all other FERC tariffs. *Id.* Subsequently, in *Opinion No. 526*, 143 F.E.R.C. ¶ 61,116 (2013), FERC disapproved depreciation rates established in a Texas retail settlement, but required that they be used in the Bandwidth Formula.

The "retail regulators" language in the Bandwidth Formula was based on virtually identical language in Service Schedule MSS-4, which preexisted the Bandwidth Formula. *Opinion No. 523-A*, ¶ 5; J.A. ___. In *Opinion No. 523-A*, FERC ruled that the language means FERC has to use retail depreciation rates in the Bandwidth Formula, but not for Service Schedule MSS-4. *Id.*, ¶ 37; J.A. __. FERC said the different meanings ascribed to the same language was based on the "context" in which they are applied. *Id.*

## SUMMARY OF THE ARGUMENT

1.    The Bandwidth Tariff is a cost allocation rate formula that *compares* the production costs of each Company and requires payments and receipts to bring them within the +/- 11 percent bandwidth. For the tariff to work,

- 27 -

the costs entering it must be comparable.   Most of the included costs reflect expenses actually incurred in the relevant test year, but depreciation is a book allowance that expenses investment costs over time.   If the depreciation expense entering the tariff for different Companies is inaccurate, it distorts the comparison and prevents the tariff from working in a just and reasonable fashion.

FERC's depreciation standard for ratemaking and accounting requires that utilities use a method that "allocates in a systematic and rational manner the service value of depreciable property over the service life of the property."   18 C.F.R. Pt. 101, *Gen'l Instr. 22(A)*.   Further, it requires that service lives "must be supported by engineering, economic, or other depreciation studies."   *Id.*, *Gen'l Instr. 22(B)*.   In this case, the LPSC relied on Entergy's own depreciation studies, prepared at the direction of the ALJ in the second bandwidth proceeding.   These studies showed that the service lives assumed in retail depreciation rates were erroneous for virtually every Entergy generating unit.   Further, the retail rates were based on studies made decades in the past, reflecting inconsistent methodologies and assumptions.   The studies showed that the retail rates are erroneous by tens of millions of dollars, primarily due to obsolete service life assumptions.

Both the Trial Staff and the LPSC submitted testimony establishing that the use of inconsistent and erroneous depreciation inputs is unjust and unreasonable in the Bandwidth Tariff.   The retail expense allowances are

- 28 -

calculated using different assumptions for similar units and distort the Bandwidth Calculation. Faster-than-appropriate depreciation, for example, allows a Company to "export" its capital costs through the Bandwidth Formula -- the exact result Entergy sought in delaying recognition of the license life extensions for the ANO units. In that case alone, Entergy calculated that the exportation of capital costs through faster depreciation would save Entergy Arkansas ratepayers hundreds of millions of dollars compared to what they otherwise would pay for the units.

No party contested this evidence; instead, they argued that there is something "unique" about the Bandwidth Formula that requires using retail depreciation rates. *Opinion No. 519*, ¶¶ 20, 41; J.A. __ (approving ALJ's redefinition of issue)]. FERC in its decisions repeatedly distinguished the Bandwidth Tariff from other FERC tariffs, but never explained why the alleged distinction should permit the use of inaccurate depreciation inputs. FERC never addressed the effect of permitting inconsistent allowances for depreciation to enter the cost comparison; indeed, it never discussed the cost data submitted by the Trial Staff and the LPSC.

FERC's decisions are arbitrary because they do not confront the evidence, do not include factual findings on the relevant points, do not connect the evidence to FERC's conclusions, and do not explain how the distortion of the Bandwidth Calculation can be just and reasonable. *Philadelphia Gas Works v.*

- 29 -

*FERC*, 989 F.2d 1246, 1251 (D.C. Cir. 1993) (waving "'unique facts and circumstances'" as a wand "over an undifferentiated porridge of facts" not reasoned decisionmaking).

      2.    FERC arbitrarily ruled that its own depreciation policy and regulation do not apply to the Bandwidth Formula, without providing any explanation.  FERC held that its *Boston Edison* policy to use the NRC license lives for nuclear units, applied in all other cases, is not applicable here because "[t]he Commission has not codified its *Boston Edison* policy."  *Opinion No. 519*, ¶ 112; J.A. __.  It said that "due to the nature of the bandwidth formula, the Commission's ratemaking practices should not apply in all instances."  *Id.*  FERC *has codified* the requirement to allocate depreciation expense over an asset's service life, but it ruled that its accounting regulation requiring the use of service lives did not matter, because the retail rates "*are* the Commission-approved depreciation rate for bandwidth formula purposes, and the resulting amount of depreciation expense is appropriately recorded . . . in the FERC depreciation accounts . . . ."  *Id.*, ¶ 113; J.A. __.

      The Court will search in vain for an explanation of *why* FERC's policy, its ratemaking practice, and its regulation should not apply to the Bandwidth Tariff.  If anything, the need for a consistent basis to determine depreciation allowances is paramount in a tariff that compares Company

1205296v.1

production costs and brings them to within a prescribed bandwidth. FERC has many cost allocation tariffs, including other Service Schedules in the System Agreement, and it applies its own policies in setting those rates. Indeed, FERC has ruled that the retail-set Arkansas and Texas depreciation rates are unjust and unreasonable and replaced them for other tariffs, but directed their use in the Bandwidth Formula and for FERC accounting. FERC's failure to explain the deviation from its own policy and regulation renders its decisions arbitrary.

　　　　3.　　In *Louisiana Pub. Serv. Comm'n v. FERC*, 761 F.3d 540, 552 (5th Cir. 2014), the Fifth Circuit ruled that FERC's adoption of a tariff that utilized retail-set depreciation rates was not an unlawful subdelegation of its statutory function, because FERC committed to exercise its authority in this complaint proceeding. But now, FERC has retracted its requirement that retail changes be filed for approval by FERC, has made clear that retail practices control over its own policy and regulation, and has determined that retail rates included in the Bandwidth Formula control FERC accounting. FERC has adopted retail depreciation rates, whatever they are and however they change, for the Bandwidth Tariff and FERC accounting. FERC's action constitutes an unlawful subdelegation of its authority over the Bandwidth Tariff, and depreciation accounting, in violation of this Court's precedent. *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004) ("*U.S. Telecom*").

1205296v.1

An agency subdelegates its authority when it shifts to another party "almost the entire determination of whether a specific statutory requirement . . . has been satisfied." *Id.* at 567. Here, FERC eliminated its own authority to even review the depreciation decisions of the five retail agencies and allowed them to determine the justness and reasonableness of rates and the accuracy of accounting data. FERC's decisions unlawfully subdelegate responsibilities Congress vested in FERC and unlawfully abdicate its duty to ensure that rates are just and reasonable. *La. Pub. Serv. Comm'n v. FERC*, 184 F.3d 892, 897 & n. (D.C. Cir. 1999).

4.    In *Opinion No. 519*, FERC ruled that the LPSC could not obtain relief prior to the filing of the complaint, even if the LPSC ultimately prevailed. *Opinion No. 519*, ¶ 26; J.A. __. But FERC's own procedural shell game delayed the filing of the complaint; FERC first said that all issues related to the justness and reasonableness of costs should be litigated in bandwidth proceedings, then it dismissed a 2008 LPSC depreciation complaint, then two ALJs held in bandwidth proceedings that the depreciation rates were unjust and unreasonable, then FERC in 2010 said the issue could only be raised in a new complaint. *Opinion No. 505*, ¶ 173; J.A. __. The Fifth Circuit ruled that this issue is premature until the LPSC prevails; the LPSC raises it here to ensure that it is preserved.

1205296v.1

## STANDARD OF REVIEW

As to matters within its statutory authority, FERC's decisions are reviewed under the "arbitrary and capricious" standard.  5 U.S.C. § 706(2)(A).  In applying this standard, the courts require that agencies respond meaningfully to contentions before it and articulate a "'rational connection between the facts found and the choice made.'"  *PPL Wallingford Energy, LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005).  The decision must not run counter to the evidence and must reflect reasoned decisionmaking.  *Kristin Brooks Hope Ctr. v. FCC*, 626 F.3d 586, 588, 591 (D. C. Cir. 2010).

When an agency departs from its own policy or precedents, it must provide a reasoned basis for the departure.  *La. Pub. Serv. Comm'n v. FERC*, 184 F.3d 892, 897 (D.C. Cir. 1999).  Similarly, FERC must apply its own policies or articulate valid reasons for departing from them in an individual case.  *FERC v. Triton Oil & Gas Corp.*, 750 F.2d 113, 115-17 (D.C. Cir. 1984).  FERC may not rely on decisions of retail agencies, but must apply its own precedents.  16 U.S.C. §§ 824d, 824e, 825; *N. States Power Co. v. FPC*, 118 F.2d 141, 144 (7th Cir. 1941).

The FPA provides FERC with plenary jurisdiction over wholesale ratemaking, utility accounting, and utility depreciation.  16 U.S.C. §§ 824d, 824e, 825, 825a.  FERC exercises this jurisdiction in all three areas.  FERC may not

- 33 -

subdelegate this jurisdiction to an outside agency. *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004). "[A]s to matters within its jurisdiction, the Commission has the duty -- not the option -- to reform rates that by virtue of changed circumstances are no longer just and reasonable." *La. Pub. Serv. Comm'n v. FERC*, 184 F.3d 892, 897 (D.C. Cir. 1999).

FERC is obligated to make parties whole from harm resulting from its own legal errors. *Exxon Co., USA v. FERC*, 182 F.3d 30, 49 (D.C. Cir. 1999). FERC cannot deny legal rights by retroactively changing its required procedure. *McDonald v. Watt*, 653 F.2d 1035, 1042 (5th Cir. 1981).

## STANDING

The LPSC is a state agency with authority to regulate retail rates in Louisiana. La. Const. art. IV, § 21. The LPSC brought the complaint that led to the creation of the Bandwidth Tariff and the complaint in this proceeding. The FPA provides the LPSC with standing because it represents consumers aggrieved by FERC's Order. 16 U.S.C. § 8251(b).

## ARGUMENT

I. **FERC'S RULINGS ARE ARBITRARY BECAUSE FERC FAILED TO CONFRONT THE EVIDENCE AND FAILED TO EXPLAIN HOW INCORRECT AND INCONSISTENT DATA MAY LAWFULLY BE USED IN A TARIFF DESIGNED TO COMPARE COSTS AND ELIMINATE UNDUE COST DIFFERENCES.**

FERC's own Trial Staff and the LPSC showed that the use of inconsistent depreciation methods in determining inputs to a cost comparison tariff

- 34 -

is unjust and unreasonable. They demonstrated that the retail-set depreciation rates were outdated, employed inconsistent methodologies, and distorted the Bandwidth Calculation. The best evidence of the distorting effect was Entergy's own study for Entergy Arkansas, which determined that the Company could reduce its capital costs by hundreds of millions of dollars by accelerating inflated depreciation expense into the years in which it was subject to the Bandwidth Formula and resetting depreciation to a much lower level thereafter. No one disputed that the depreciation rates were grossly incorrect under accepted accounting and depreciation standards, including FERC's policy and regulation. Yet FERC approved the use of these retail-set rates in a decision that did not confront or analyze the evidence at all.

In route to her ruling that the retail-set depreciation rates are "per se" just and reasonable regardless of the evidence, the ALJ defined the issue as articulated by the APSC: "'whether, in the unique circumstances of the [b]andwidth [f]ormula calculation, the Commission can continue its established practice of using retail regulator-determined depreciation rates in the [b]andwidth [f]ormula calculation.'" *See Opinion No. 519*, ¶ 20; J.A. __. She ruled that the formula language "permits deference to the depreciation decision of retail regulators," that the retail depreciation inputs are "*per se* just and reasonable," the Commission's *Boston Edison* policy for nuclear depreciation does not control for

- 35 -

the Bandwidth Calculation, that changes in circumstances since the retail rates were first adopted do not matter, and that inconsistent depreciation inputs are permissible in the Bandwidth Formula.  [I.D., ¶ 25, 27, 28, 29, 30; J.A __].  In a proceeding set to test the justness and reasonableness of the tariff, the ALJ essentially held that the language in the tariff precluded any change to the tariff.

Opinion No. 519 recognized that the ALJ "never assess[ed], in general or in the abstract, whether the retail depreciation rate information used in the bandwidth formula is consistent with Commission precedent concerning depreciation for wholesale sales."  Opinion No. 519, ¶ 42.  FERC ruled that this approach was "sound."  Id.  FERC found that the Trial Staff and the LPSC failed to carry the burden of proof because conflicts with Commission policy are irrelevant in the "context of the bandwidth formula remedy."  Id., ¶ 112; J.A. __.  FERC said the "Commission's ratemaking practices should not apply in all instances."  Id.

FERC never confronted the evidence that consistency is required in a tariff that compares production costs and then brings differences among the Companies to the +/- 11 percent limit of due discrimination.  Staff witness John Sammon testified that the Bandwidth Formula is supposed to calculate costs based on "FERC policy, regulations, findings and precedents."  [S-1 at 23; J.A. __].  He testified that the retail depreciation inputs were unjust and unreasonable because they "have reflected conflicting depreciation rate policy choices and have been

1205296v.1

contrary to FERC depreciation precedents."  [*Id.* at 22; J.A. __].  He said:  "Only FERC can make certain that the depreciation expense and related items included in the computation of each Operating Company's annual bandwidth production cost-of-service comply with FERC depreciation precedents and that these inputs are calculated on a consistent basis for all Operating Companies."  [*Id.* at 23; J.A. __].

LPSC witness Lane Kollen showed that the depreciation inputs were developed using inconsistent methods and were based on service life assumptions that had become erroneous.  [LC-1 at 12-19; J.A. __].  He testified:

> Differences in the methodologies for developing depreciation rates lead to differences in the rate at which capital investment is expensed, even for similar plants. These differences lead to an unduly discriminatory redistribution of depreciation expenses through the bandwidth.  For example, a comparatively faster depreciation rate allows one company to export depreciation expense through the bandwidth to other companies.  The exportation of excessive depreciation expense through the use of different, accelerated depreciation rates for some generating units, but not other similar generating units, produces discrimination in each bandwidth year, and the damage never cancels out if some companies withdraw from the bandwidth calculation.

[LC-1 at 19; J.A. __].

Perhaps the best evidence of the distorting effect of incorrect depreciation rates was Entergy's study of bandwidth effects, which led to its

decision not to update the depreciation rates for the life extensions of the ANO units, owned by Entergy Arkansas, from 40 to 60 years.  This study was produced in the first bandwidth proceeding.   An employee in Entergy's "Regulatory Strategy" department performed "a quick and dirty analysis of the impact of changing nuclear depreciation rates either before or after [Entergy Arkansas] leaves the System Agreement."  [LC-17 at 2].  Effectively, Entergy Arkansas could export future capital costs by advancing their recognition into the Bandwidth Formula.

The study showed that Entergy Arkansas could transfer its capital costs to other jurisdictions by leaving its depreciation rates at incorrect, excessive levels.   Entergy concluded the Company could avoid hundreds of millions of dollars of capital costs through this strategy.  [LC-17 at 3; J.A. __].  By leaving the depreciation expense at $69 million per year rather than the $32.3 million that would reflect correct service lives -- a difference of $36.7 million -- Entergy Arkansas would export $29.4 million annually through the Bandwidth Formula. [*Id.*].  These costs would be removed from the books, lowering long-term capital cost obligations for retail ratepayers.  [*Id.*].

An Entergy Arkansas executive, after reviewing the analysis, stated:

Given the assumptions, [Entergy Arkansas] customers would pay an absolute $500 million more if depreciation rates were reduced now based on reflecting the longer ANO lives compared to leaving the depreciation rates the

way they are for now, but reducing them after the SA remedy payments are over. On a PV basis, the figure is about $230 million. Is that right?

[*Id.* at 6; J.A. __]. The analyst responded: "Yes, you are correct." [*Id.*].

Prior to a retail rate case Entergy Arkansas filed in 2006, Entergy and/or Entergy Arkansas representatives met several times with members of the APSC Staff or the APSC Commissioners' advisory staff. [LC-18; J.A. __]. According to an Entergy data response, it made a presentation concerning the operation of the bandwidth and informed the APSC that Entergy Arkansas did not intend to file a depreciation study. [*Id.* at 1; J.A. __]. In response, the APSC permitted Entergy Arkansas to include depreciation charges for retail ratemaking based on incorrect nuclear service lives. [LC-1 at 26; J.A. __].

After the LPSC filed the complaint in this case, the APSC updated Entergy Arkansas's depreciation rates using the correct service lives. But the update did not affect the Bandwidth Calculation until 2011, and then only for part of the test year. Moreover, FERC disapproved the revised rates in part and required their recomputation for FERC ratemaking. *Entergy Servs., Inc.,* ("*Opinion No. 523*"), 142 F.E.R.C. ¶ 61,022, ¶ 126 (2013). [J.A. __]. Yet FERC ruled the retail rate it found unjust and unreasonable must be used in the Bandwidth Formula and for FERC accounting. *Id.*, ¶¶ 197-98; J.A. __.

- 39 -

The consistency point was also illustrated in an example used in the cross-examination of witnesses for Entergy and the APSC.  In the example there are five Companies of equal size, each of which is making or receiving payments in the Bandwidth Calculation.  Each adds generating units identical with the others, at an investment cost of $2000.  Company A depreciates its unit over 10 years, while the others use 20-year lives, so that Company A's depreciation expense is $100 greater than that of the other Companies.  [LC-95; J.A. ___].  Entergy witness Bruce Louiselle testified:

> Q.  The way the bandwidth works, that incremental $100 would affect the payments and receipts among the companies; correct?
>
> A.  Yes.
>
> Q.  Company A would have an $80 effect, either causing it to get a higher payment by $80 or make a lower payment by $80 if its depreciation expense were reflected at 200 rather than 100 in that situation; right?
>
> A.  Yes.  It would receive -- let's assume it's a receiving company. It would receive $80 more, so that its costs and rates to its customers would go up by only $20.
>
> Q.  And that $80 would come $20 each from each of the other companies; correct?
>
> A.  Yes, under your hypothetical.

[Tr. 732-33; J.A. ___].  APSC witness Dr. Keith Berry also agreed that the extra costs would affect the bandwidth payments and receipts.  [Tr. 791-92; J.A. ___].

1205296v.1

No one, including FERC, disputed these effects. Instead, they argued and FERC determined that there is something unique about the Bandwidth Tariff that makes them irrelevant. *Opinion No. 519*, ¶ 42; J.A. __. But the whole purpose of the Bandwidth Tariff is to compare Company production costs and bring them within the +/- 11 percent bandwidth. If different allowances for the same type of costs are compared, the formula cannot work properly. FERC's decisions arbitrarily fail to address this fundamental proposition.

In its sole attempt to justify using retail allowances rather than following its own policy in the Bandwidth Tariff, FERC said that it had affirmed the presiding judge's exclusion of costs that the LPSC ruled were imprudent in the original Remedy case. *Opinion No. 519*, ¶ 112; J.A. __. On rehearing, the LPSC pointed out that the ALJ's ruling "only addressed costs that were admittedly imprudent," and "rejected the argument that other retail disallowances should be reflected in the production cost calculation." [LPSC Reh. Req. at 23; J.A. __]. The LPSC showed that the judge's ruling required a *consistent* calculation, and in any event, the imprudence disallowance did not conflict with Commission precedent or the FPA. [*Id.* at 23-24; J.A. __].

In *Opinion No. 519-A*, FERC said that the ALJ's requirement of uniformity in the Remedy case, except for the prudence disallowance, was irrelevant: "[T]he instant case does not involve retail disallowances, but

- 41 -

1205296v.1

depreciation rates." *Opinion No. 519-A*, ¶ 19; J.A. __. Then, two paragraphs later, it again relied on the prudence disallowance in that case to justify its use of retail depreciation rates, without explaining how it was analogous. *Id.*, ¶ 21; J.A. __. This is not reasoned decisionmaking.

FERC's reliance on the original Remedy decision is also unavailing because FERC later determined that it would *not* treat other retail prudence decisions as determinative for the Bandwidth Tariff because that would be an impermissible subdelegation of authority. *Entergy Servs., Inc.*, 120 F.E.R.C. ¶ 61,020, ¶ 28 (2007) ("The Commission's ratemaking obligations under the FPA cannot be delegated to a state commission.").

In assessing the LPSC's complaint, FERC was required to confront the arguments before it and the evidence and articulate a reasoned basis for its determination. As the Court said in *Kristin Brooks Hope Ctr. v. FCC*, the Court's "primary task is to ensure that the agency has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.' The agency's explanation cannot 'run[] counter to the evidence,' and it must 'enable us to conclude that the [agency's action] was the product of reasoned decisionmaking.'" 626 F.3d 586, 588 (D.C. Cir. 2010) (citations omitted). An agency's "'failure to respond meaningfully' to objections raised by a party renders its decision arbitrary and capricious." *PPL*

- 42 -

*Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005). Unless an agency "answers objections that on their face seem legitimate, its decision can hardly be classified as reasoned." *Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 299 (D.C. Cir. 2001).

There is substantial evidence that the use of inconsistent depreciation rates, premised on outdated assumptions, in the Bandwidth Tariff unjustly and unreasonably distorts the calculation. There is no evidence to the contrary. FERC stated that it was not persuaded, but it did not address the evidence or explain its conclusion. *Opinion No. 519-A*, ¶ 55; J.A. __. This failure renders its decision arbitrary.

## II.    FERC ARBITRARILY FAILED TO PROVIDE A REASONED BASIS FOR ITS DEPARTURE FROM PRECEDENT, POLICY AND ITS OWN DEPRECIATION REGULATION.

FERC's ratemaking policy and its accounting regulation require that utilities allocate depreciation costs in a "systematic and rational" manner over the "service life of the property." 18 C.F.R. Pt. 101, *Gen'l Instr. 22(A)*. FERC requires that estimated service lives be supported by "engineering, economic, or other depreciation studies." *Id.*, *Gen'l Instr. 22(B)*. For nuclear plants, FERC requires that service lives be based on the NRC license lives of the units; it applied this policy in 2008 to Entergy's Grand Gulf unit, the costs of which enter the Bandwidth Calculation, at the urging of Entergy and the APSC. *La. Pub. Serv.*

*Comm'n v. Sys. Energy Res., Inc.*, 124 F.E.R.C. ¶ 61,003, ¶ 14 (2008).  FERC requires that utilities file for approval of changes in depreciation rates that affect FERC formula tariffs.  *Order No. 618*, 92 F.E.R.C. ¶ 61,078, 2000 FERC LEXIS 1500, at *14 n.25 (2000).  But FERC ruled, in conclusory language and without explanation, that these FERC ratemaking policies and regulation do not apply to the Bandwidth Tariff.

The evidence established that the service lives assumed in the retail depreciation rates are incorrect.  Entergy's depreciation studies showed that the retail depreciation rates were based on estimated retirement dates that were erroneous for 74 of 75 generating units.  [*Compare, e.g.*, LC-4 at 24-27, *with* LC-19 at 36-37 (Entergy Arkansas); J.A. __].  The studies assumed 28 of the units would have been retired before 2008, but they were still operating and being depreciated in that year.  [LC-1 (LPSC witness Kollen) at 17; J.A. __].  As LPSC witness Kollen stated, for these units "depreciation expense is front-loaded, or accelerated, because it reflects a shorter and now past life span rather than the correct life span."  [*Id.* at 18; J.A. __].

FERC policy requires that the service lives of nuclear units reflect the NRC license lives and Entergy's studies also used the license lives.  But the retail depreciation rates reflect longer or shorter lives than the license lives.  [LC-1

1205296v.1

(LPSC witness Kollen) at 16].  In particular, the Entergy Arkansas depreciation rates did not reflect the life extensions for the ANO units that the NRC granted in 2001 and 2005.  [Tr. 640 (Entergy witness Lewis); J.A. __].  As the ALJ in the first bandwidth proceeding ruled, "it can easily be said that the APSC's failure to readjust the depreciation expenses when the NRC granted the license extension does not comport to any reasonable accounting standard or established FERC precedent . . . ."  *Initial Decision*, 124 F.E.R.C. ¶ 63,026, ¶ 483 (2008).

FERC acknowledged that the retail depreciation rates conflicted with FERC policy.  *Opinion No. 519*, ¶ 112; J.A. __.  It said that the policy need not apply because it was "not codified."  *Id.*  Of course, the requirement to use study-based service lives *is codified*, but FERC dealt with that by saying the Bandwidth Formula trumps FERC accounting requirements.  *Opinion No. 519-A*, ¶ 22.  FERC compared the use of retail depreciation rates to the acceptance of the undisputed retail imprudence determination in the *Opinion No. 480* case, which did not conflict with FERC policy.  *Opinion No. 519*, ¶ 112.  FERC never explained why its ratemaking and accounting policy should not apply to the Bandwidth Tariff.

FERC repeatedly suggested that the Bandwidth Tariff is unique, but that is not an explanation.  If anything, the need for uniformity is paramount in a

- 45 -

tariff that compares costs and brings them to within a prescribed bandwidth. [S-1 (Staff witness Sammon) at 23-24 (describing general elimination of retail adjustments from the Bandwidth Calculation); LC-1 (LPSC witness Kollen) at 19 ("differences lead to an unduly discriminatory redistribution of depreciation expenses through the bandwidth"); J.A. __, __].

Moreover, there is nothing unique at FERC about a cost allocation tariff.  Service Schedule MSS-1 equalizes the cost of reserve capacity and includes depreciation expense.  Service Schedule MSS-2 precisely equalizes Company investment costs, including depreciation, for bulk power transmission facilities. FERC requires those and all other cost allocation tariffs, except the Bandwidth Tariff, to conform to its own policies and practices.  *See, e.g.*, *Entergy Servs., Inc.*, 132 F.E.R.C. ¶ 61,252, ¶ 19 (2010) (setting revised depreciation rates in Service Schedules MSS-1, MSS-2, MSS-3, and MSS-4, Entergy's OATT rates and Entergy Arkansas's wholesale requirements rates for evidentiary hearing and distinguishing Bandwidth Formula).  FERC held that its policies apply to Service Schedules MSS-1 and MSS-4, but ruled, based on the same tariff language, that they do not apply to the Bandwidth Formula.  *Opinion No. 523*, ¶¶ 195-98; J.A. __.

FERC's general order on depreciation requires all utilities to file for approval of changes in depreciation rates entering FERC formula rates.  *Order No. 618*, 92 F.E.R.C. ¶ 61,078, 2000 FERC LEXIS 1500, at *14 n.25 (2000).  In its

- 46 -

initial rulings in bandwidth proceedings, FERC made clear that Entergy had to file for approval of depreciation changes entering the Bandwidth Formula. *E.g.*, *Opinion No. 505*, 130 F.E.R.C. ¶ 61,023, ¶ 172 n.205 (2010). But FERC reversed these determinations in *Opinion No. 519*, holding that "the Commission's policy on changes in depreciation in formula rates established in Order No. 618 does not apply to the bandwidth formula . . . ." *Opinion No. 519*, ¶ 26; J.A. __.

Other than general references to the supposedly unique nature of the Bandwidth Tariff, FERC provided no explanation for these rulings. Its rulings are conclusory: the *Boston Edison* policy is "not codified;" because the retail depreciation rates are permitted in the Bandwidth Formula, they also control for accounting; *Order No. 618* "does not apply to the bandwidth formula." *Opinion No. 519*, ¶¶ 112, 113, 26; J.A. __. FERC never explained why the departure from policy and the regulation is justified.

FERC acts arbitrarily when it departs from its own policy or precedent without a reasoned explanation. *La. Pub. Serv. Comm'n v. FERC*, 184 F.3d 892, 897 (D.C. Cir. 1999) ("[f]or [an] agency to reverse its position in the face of a precedent it has not persuasively distinguished is quintessentially arbitrary and capricious"); *Nathan Katz Realty LLC v. NLRB*, 251 F.3d 981, 993 (D.C. Cir. 2001) ("It is 'axiomatic that an agency adjudication must either be consistent with prior adjudications or offer a reasoned basis for its departure from precedent.'"). A

- 47 -

1205296v.1

reference to unique facts is insufficient, because FERC "must identify the facts, circumstances, and equitable factors on which it relies." *Philadelphia Gas Works v. FERC*, 989 F.2d 1246, 1250 (D.C. Cir. 1993).

Similarly, FERC must articulate valid reasons for departing from its own regulations. *Fed. Energy Reg. Comm'n v. Triton Oil & Gas Corp.*, 750 F.2d 113, 116 (D.C. Cir. 1984) ("The Commission may not abuse its discretion by arbitrarily choosing to disregard its own established rules and procedures in a single, specific case. Agencies must implement their rules and regulations in a consistent, evenhanded manner."); *Shell Oil Co. v. FERC*, 664 F.2d 79, 83-84 (5th Cir. 1981) (FERC is obliged to follow its regulations unless it provides valid reasons for a departure.)

Further, both this Court and FERC have made clear that the agency should follow its own policies rather than retail policies with respect to accounting. As the Court ruled in affirming FERC's refusal to follow retail agency practices with respect to accounting, FERC is obliged to follow its own precedents. *Kentucky Util. Co. v. FERC*, 760 F.2d 1321, 1326-27 (D.C. Cir. 1985) ("But even more fundamentally, FERC is not, as we noted above, bound to follow a state commission's considered judgment with respect to either accounting or ratemaking. FERC must, rather, follow its own precedents or, alternatively, provide a reasoned explanation for a material departure therefrom."). FERC has ruled that utilities

- 48 -

must follow FERC rules for depreciation in ratemaking and accounting, regardless of differing retail rates. *Ohio Edison Co.*, 84 F.E.R.C. ¶ 61,157, at 61,859-861 (1998); *Westar Energy, Inc.*, 131 F.E.R.C. ¶ 61,183, ¶ 20 (2010) ("The Commission must evaluate, on its own, whether the proposed depreciation rates are just and reasonable.").

FERC's decisions do not articulate any valid reason for departing from its depreciation precedents and regulation. There is every reason in this case to follow FERC precedent. The Bandwidth Formula requires consistency and the application of FERC's policy would provide it. The determination that inconsistency is permissible because the Bandwidth Formula is "unique" is conclusory and illogical. FERC did not explain it because it cannot be explained. The rulings thus are arbitrary.

## III. FERC'S DETERMINATION THAT RETAIL DEPRECIATION RATES MUST BE USED FOR THE BANDWIDTH TARIFF AND FERC ACCOUNTING CONSTITUTES AN UNLAWFUL SUBDELEGATION OF ITS RATEMAKING AND ACCOUNTING AUTHORITY.

FERC's determinations allow retail regulators in different states to establish the depreciation rates to be used in the Bandwidth Tariff and for FERC accounting. Retail changes in depreciation rates may affect the cost allocations in the Bandwidth Formula without FERC review. FERC now requires Entergy to record depreciation expense for FERC accounting according to prescriptions in

- 49 -

retail jurisdictions rather than the FERC accounting regulation.   Even retail depreciation rates that FERC finds unjust and unreasonable must be used in the Bandwidth Tariff and for FERC accounting.   These decisions unlawfully shift to five different retail regulators "the entire determination of whether a specific statutory requirement" -- just and reasonable costs entering rates -- has been satisfied.  *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 567 (D.C. Cir. 2004).

In the appeal of FERC's decision in the second bandwidth proceeding, the Fifth Circuit ruled that FERC's reinterpretation of the Bandwidth Formula to require the use of retail-set-depreciation inputs was not an unlawful subdelegation. The court determined that FERC:  a) had exercised its authority when it adopted the Bandwidth Formula, and b) had committed "to exercise oversight of the state rates in a Section 206 complaint proceeding."  *La. Pub. Serv. Comm'n v. FERC*, 761 F.3d 540, 552 (5th Cir. 2014).  In the subsequent appeal of FERC's decision in the first bandwidth proceeding, which had been abeyed, the LPSC attempted to show that the Fifth Circuit's decision was inconsistent with the Court's ruling in *U.S. Telecom*, but this Court ruled that the LPSC's objections were raised in the "wrong forum."  *La. Pub. Serv. Comm'n v. FERC*, 606 F. App'x. 1, 4 (D.C. Cir. 2015).  It ruled that the underlying proceeding is the "appropriate forum."  *Id.*

In the decisions under review, FERC has gone much further than it had when the case was before the Fifth Circuit.  Now, it has ruled that its own

policies and regulation do not apply to the Bandwidth Formula. Retail rate changes can enter the formula and reset the rates without FERC approval. The retail-set depreciation expenses Entergy records do not have to comply with FERC's accounting regulation. Even if FERC rules that retail depreciation rates are unjust and unreasonable, they must still be used for the Bandwidth Tariff and FERC accounting. FERC's decisions pre-approve retail changes for the Bandwidth Tariff and FERC accounting, no matter how derived. These rulings represent an unlawful subdelegation of FERC's authority over ratemaking and depreciation accounting.

### A.     FERC Unlawfully Subdelegated the Ratemaking Authority that the FPA Vests Exclusively in FERC.

*Opinion Nos. 519* and *519-A* hold that retail-set depreciation rates control for the Bandwidth Tariff, regardless of the effect on the cost allocations and conflicts with FERC policy and precedent. *Opinion Nos. 523* and *523-A* determine that even if FERC rules that retail-set depreciation rates are unjust and unreasonable, they still must be used in the Bandwidth Tariff. *Opinion No. 523-A*, ¶ 33; J.A.___. These decisions unlawfully subdelegate FERC's ratemaking jurisdiction to five different retail agencies.

The FPA provides FERC with exclusive jurisdiction to regulate wholesale electric rates. 16 U.S.C. §§ 824d, 824e. As this Court ruled in *Mississippi Industries v. FERC*, 808 F.2d 1525, 1547, *vacated in part on another*

*issue*, 822 F.2d 1103 (D.C. Cir. 1987), FERC has exclusive jurisdiction to regulate wholesale transactions on the Entergy System.  The U.S. Supreme Court had held that this jurisdiction preempts inconsistent retail determinations.  *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 371-72 (1988).

This Court has held that FERC may not abdicate its exclusive jurisdiction over the Entergy System based on the premise that Entergy is subject to regulation in the retail jurisdictions.  *La. Pub. Serv. Comm'n v. FERC*, 184 F.3d 892, 897 (D.C. Cir. 1999).  In that case, FERC suggested that "because the Entergy system may be viewed as a single seller at retail, the Commission need not regulate antecedent wholesale transactions among the operating companies."  *Id.*  The Court rejected that premise:

> If that is the point, we reject it out of hand.  As we have held before, and as the Commission itself has long insisted, it alone has jurisdiction to regulate wholesale transactions among Entergy's operating companies.  And as to matters within its jurisdiction, the Commission has the duty -- not the option -- to reform rates that by virtue of changed circumstances are no longer just and reasonable. . . .

*Id.* (citations omitted).

Thus, FERC has exclusive jurisdiction over the cost allocations among the Entergy Companies and must exercise that jurisdiction to ensure that rates are just and reasonable.  But in this case, FERC ordered that different retail-set depreciation allowances must be used in the Bandwidth Tariff, regardless

- 52 -

of conflicts with FERC policy and its regulation. *Opinion No. 519*, ¶¶ 112, 113; J.A. __. If retail regulators change the depreciation rates used in retail rates, they must be used in the Bandwidth Tariff without any review by FERC. *Id.*, ¶ 26; J.A. __. If FERC rules that the retail rates are unjust and unreasonable and replaces them for use in other Entergy wholesale tariffs, they still must be used in the Bandwidth Tariff. *Opinion No. 523*, ¶¶ 195-98; J.A. __; *Opinion No. 526*, 143 F.E.R.C. ¶ 61,116, ¶ 34 (2013).

These decisions impermissibly subdelegate FERC's authority to establish wholesale electric rates. In *U.S. Telecom*, this Court ruled that the Federal Communications Commission ("FCC") could not subdelegate its regulatory authority to state agencies absent affirmative evidence of authority to do so. It rejected a subdelegation attempted by the agency. The Court said:

> We therefore hold that, while federal agency officials may subdelegate their decision-making authority to subordinates absent evidence of contrary congressional intent, they may not subdelegate to outside entities -- private or sovereign -- absent affirmative evidence of authority to do so.

*Id.* at 566.

The subdelegation in *U.S. Telecom* was less comprehensive than FERC's subdelegation here. In that case, the FCC provided standards to the state agencies to use in determining whether to eliminate or impose a requirement to unbundle telecommunications access to competitive carriers, which were

consistent with the objectives of federal law.  The state agencies were given a time period in which to act and if they failed to do so, the FCC would step in and perform the required analysis.  *Id.* at 564.  Nevertheless, the Court held that the Commission's subdelegation of authority was unlawful.  *Id.* at 566.

In *Calvert Cliffs' Coordinating Comm., Inc. v U.S. Atomic Energy Comm'n*, 449 F.2d 1109 (D.C. Cir. 1971), the Court explained why a federal agency could not delegate its decisional authority to a state environmental agency. It determined that state agencies have their own perspectives on issues and are not in a position to enforce the objectives of federal law.  The Court said:  "The only agency in a position to make such a judgment is the agency with overall responsibility for the proposed federal action -- the agency to which NEPA is specifically directed."  *Id.* at 1123.

Additionally, the Court has ruled that FERC cannot rely on a state approval as a substitute for exercising its independent authority over wholesale rates.  *Missouri Pub. Serv. Comm'n v. FERC*, 337 F.3d 1066 (D.C. Cir. 2003).  The Court said:  "In sum, FERC may not brandish a state's prior approval of a set of existing rates as if it were independently sufficient to satisfy the Commission's own regulatory obligations."  *Id.* at 1077.

In rejecting the argument that the rulings in the second bandwidth proceeding unlawfully subdelegated FERC's ratemaking jurisdiction, the Fifth

1205296v.1

Circuit relied on FERC's initial adoption of the "retail regulators" language as an exercise of authority. *La. Pub. Serv. Comm'n v. FERC*, 761 F.3d 540, 552 (5th Cir. 2014). But that is no different from *U.S. Telecom*, where the FCC decided that relying on retail decisions was reasonable. 359 F.3d at 565. The Fifth Circuit also relied on the availability of Section 206 review to support its decision. 761 F.3d at 551-52. But in *U.S. Telecom,* the FCC retained the same ability to change the tariff prospectively that FERC possesses under Section 206. 47 C.F.R. § 1.401; 5 U.S.C. § 553. The subdelegation occurred for the time the tariff was effective. Thus, the Fifth Circuit's decision is inconsistent with *U.S. Telecom*.

In any event, FERC in the decisions below went much further than it had in the rulings reviewed by the Fifth Circuit. *Opinion No. 519* makes clear that Entergy may include depreciation changes approved by retail regulators in the Bandwidth Tariff without any FERC review. *Opinion No. 519*, ¶ 26. *Opinion No. 523* disapproved an element of a retail depreciation rate change adopted by the APSC and adjusted it for other FERC tariffs, which FERC cannot do unless the rate is unjust and unreasonable. 16 U.S.C. § 824d(a). But at the same time, FERC ruled that the unjust and unreasonable retail rate must be used in the Bandwidth Tariff. *Opinion No. 523*, ¶¶ 195-98; J.A. ___; *accord Opinion No. 526*, 143 F.E.R.C. ¶ 61,116, ¶¶ 31-32 (2013) (retail depreciation rates approved by the Public Utilities Commission of Texas were found unjust and unreasonable and

- 55 -

replaced by FERC, but FERC still required their use in the Bandwidth Formula).
FERC determined that differing local standards rather than FERC standards control
the depreciation inputs in the Bandwidth Tariff, even though FERC standards
control all the other inputs.  These decisions make clear that FERC unlawfully
subdelegated its authority over depreciation in the Bandwidth Tariff.

Additionally, FERC's tariff interpretation underscores the
subdelegation.  As FERC recognized, the "retail regulators" language was included
in Service Schedule MSS-4 along with the "unless" clause, before it was included
in the Bandwidth Tariff.  *Opinion No. 523-A*, ¶ 5; J.A. __.  In Opinion No. 523-A,
FERC interpreted the "unless" language "as providing that the Commission's
depreciation policies always apply in the context of Service Schedule MSS-4." *Id.*,
¶ 37; J.A. __.  Yet FERC interpreted the identical, transplanted language in the
Bandwidth Tariff to mean that "retail-regulator approved depreciation variables
included in the bandwidth formula are the filed rate . . . ." *Id.*, ¶ 33; J.A. ___.
FERC thus made clear its intent to provide full discretion to retail regulators to set
depreciation inputs for the Bandwidth Tariff, regardless of the FPA.  This is an
unlawful subdelegation.

**B.     FERC's Rulings Unlawfully Subdelegate Its Authority Over Depreciation Accounting.**

Section 301 of the FPA provides FERC the authority to prescribe a
"system of accounts to be kept by licensees and public utilities" and requires that

1205296v.1

utilities keep such accounts "as the Commission may by rules and regulations prescribe . . . ."  16 U.S.C. § 825(a).  Section 302 permits FERC to establish regulations to govern depreciation accounting and to prescribe depreciation charges for public utilities.  16 U.S.C. § 825a(a).  Both sections permit utilities to keep separate state-prescribed accounts to be used for state ratemaking.

FERC long ago prescribed the Uniform System of Accounts to govern utility accounting.  *Order No. 141*, 12 Fed. Reg. 8461, 8503 (Dec. 19, 1947).  Prior to 2000, however, FERC had regulated depreciation for ratemaking, but had not prescribed a rule to govern depreciation accounting.  In *Alabama Power Co.*, 160 F.3d 7 (D.C. Cir. 1998), this Court held that FERC must first promulgate a rule to govern depreciation accounting before requiring utilities to adhere to a uniform standard in the depreciation charges recorded in their accounts.  *Id.* at 8-9, 14.  In response, FERC in 2000 issued *Order No. 618*, 92 F.E.R.C. ¶ 61,078 (2000), and adopted *General Instruction 22* of the USOA, which requires that depreciation expense be allocated over the "service life of the property" and that service lives be supported by studies.  18 C.F.R. Pt. 101, *Gen'l Instr. 22(A), (B)*.

The FPA requires that utilities conform their accounts to the depreciation rules prescribed by FERC.  Section 302 states that FERC may require utilities to carry a depreciation account "in accordance with such rules, regulations, and form of account as the Commission may prescribe" and permits the

1205296v.1

Commission to "by order fix, the proper and adequate rates of depreciation" of each utility. 16 U.S.C. § 825a(a). It prohibits utilities from charging depreciation expenses "other than those prescribed by the Commission . . . ." *Id.* *General Instruction 22* states that "[u]tilities *must use* a method of depreciation that allocates in a systematic and rational manner the service value of depreciable property over the service life of the property." 18 C.F.R. Pt. 101, *Gen'l Instr. 22(A)* (emphasis added).

FERC's rules control utility accounting. States may require separate records for state ratemaking, but state determinations do not displace those of FERC. *Arkansas Power & Light Co. v. FPC*, 185 F.2d 751, 752 (D.C. Cir. 1950) ("The Federal Power Commission's authority over accounts of its licensees covers basic accounts and does not end where State authority begins."); *Kentucky Utils. Co. v. FERC*, 760 F.2d 1321, 1324, 1327 (D.C. Cir. 1985) ("FERC is not . . . bound to follow a state commission's considered judgment with respect to either accounting or ratemaking. FERC must, rather, follow its own precedents or, alternatively, provide a reasoned explanation for a material departure therefrom."). In *Ohio Edison Co.*, 84 F.E.R.C. ¶ 61,157, at 61,860-61 (1998), FERC ruled that utilities must record depreciation as prescribed by FERC and record state differences as regulatory assets or liabilities.

- 58 -

FERC accounting is especially important to the Bandwidth Tariff and other formula rates, because the formula specifies the use of data recorded in FERC accounts. The Bandwidth Formula provides that depreciation expense and accumulated depreciation be the amounts recorded in the pertinent FERC accounts. [LC-3 at 9 ("NAD"), 11 ("NDE"), 12 ("ADXN"), 14 ("DEXN"); J.A. ___]. If state-prescribed depreciation rates violate the FERC rule, they should not be able to control the amounts recorded in FERC accounts. This is particularly true when FERC has determined they are unjust and unreasonable and replaced them with just and reasonable rates. *Opinion No. 523*, ¶ 126; J.A. ___.

Despite the FPA and its own depreciation regulation, FERC here ruled that the language in the Bandwidth Tariff controls FERC accounting and preempts inconsistent FERC requirements: "Specifically, to the extent the bandwidth depreciation variables require the use of depreciation rates approved by retail regulators, those depreciation rates *are* the Commission-approved depreciation rate for bandwidth formula purposes, and the resulting amount of depreciation expense is appropriately recorded . . . in the FERC depreciation accounts . . . ." *Opinion No. 519*, ¶ 113. FERC's ruling renders depreciation accounting non-uniform, contrary to the purpose of Sections 301 and 302. This ruling constitutes an impermissible subdelegation of FERC's authority over depreciation accounting.

## IV.   FERC'S SUMMARY DENIAL OF RETROACTIVE RELIEF, AFTER FERC'S PROCEDURAL REVERSAL, ARBITRARILY DENIES A

1205296v.1

**REMEDY TO THE LPSC FOR THE PERIOD PRIOR TO THE FILING OF THE COMPLAINT.**

FERC initially directed all issues related to the justness and reasonableness of cost inputs in the Bandwidth Formula to annual bandwidth proceedings. *Arkansas Pub. Serv. Comm'n v. Entergy Servs., Inc.*, 119 F.E.R.C. ¶ 61,223 (2007). FERC dismissed a depreciation complaint filed by the LPSC, finding that the issue should be litigated in the first bandwidth proceeding, filed in 2007. *La. Pub. Serv. Comm'n v. Entergy Corp.*, 124 F.E.R.C. ¶ 61,010, ¶ 12 (2008); J.A. __. In 2010, however, FERC reversed course and ruled that the depreciation issue had to be raised in a new complaint proceeding. *Opinion No. 505*, 130 F.E.R.C. ¶ 61,023, ¶ 173 (2010); J.A. __. FERC has acknowledged that its earlier orders "may have been unintentionally misleading." *Entergy Servs., Inc.*, 130 F.E.R.C. ¶ 61,170, ¶ 20; J.A. ___.

In this complaint case, the LPSC sought both retroactive and prospective relief. FERC summarily denied retroactive relief: "[E]ven if the Louisiana Commission had shown the existing formula to be unjust and unreasonable, we would deny the request for retroactive relief." *Opinion No. 519*, ¶ 26; J.A. __. But if FERC had not initially directed depreciation issues to the first bandwidth proceeding, and dismissed the LPSC's depreciation complaint, the litigation of the issue would not have been delayed. FERC's initial error can and should be corrected by putting the parties in the "position they would have been in

1205296v.1

had the error not been made." *Exxon Co., U.S.A. v. FERC*, 182 F.3d 30, 49 (D.C. Cir. 1999). Additionally, FERC cannot change procedure retroactively unless the public interest substantially outweighs the prejudice to a party. *McDonald v. Watt*, 653 F.2d 1035, 1044 (5th Cir. 1981).

The Fifth Circuit, on review of the second bandwidth proceeding, ruled that this issue is premature unless and until the LPSC prevails on the complaint. *La. Pub. Serv. Comm'n v. FERC*, 761 F.3d 540, 556 (5th Cir. 2014). The LPSC raises the issue here to preserve it.

## CONCLUSION

FERC's ruling arbitrarily fails to confront and address the evidence, capriciously disregards FERC policy and its depreciation regulation, and unlawfully subdelegates its ratemaking and accounting authority to retail regulators. The Court should reverse and instruct FERC to exercise its statutory authority and apply its own rules, or adequately explain any departure.

Respectfully submitted,

Brandon Frey

Executive Counsel

Louisiana Public Service Commission

Galvez Building - 12th Floor

602 N. Fifth Street

Baton Rouge, Louisiana 70802

Telephone: (225) 342-9888

 */s/ Michael R. Fontham*

 */s/ Noel J. Darce*

Michael R. Fontham

Paul L. Zimmering

Noel J. Darce

Dana M. Shelton

    Of

STONE PIGMAN WALTHER

WITTMANN L.L.C.

546 Carondelet Street

New Orleans, Louisiana 70130

Telephone: (504) 581-3200

*Special Counsel to the Louisiana Public Service Commission*

- 62 -

1205296v.1

## RULE 32(a)(7)(b) CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with Rule 32(a)(7)(b). It contains 13,939 words.

*/s/ Michael R. Fontham*

*/s/ Noel J. Darce*

Michael R. Fontham

Noel J. Darce

1205296v.1

## CERTIFICATE

I hereby certify that copies of the above and foregoing Brief for Petitioner has been served upon the Solicitor of the Federal Energy Regulatory Commission and all counsel of record through the Court's CM/ECF system or via U.S. Mail, this 16th day of May, 2016.

*/s/ Michael R. Fontham*
*/s/ Noel J. Darce*
Michael R. Fontham
Noel J. Darce

- 64 -

## STATUTORY ADDENDUM

**Federal Power Act, Section 205(a)-(e), 16 U.S.C. 824d(a)-(e):**

**(a)    Just and reasonable rates**

All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

**(b)    Preference or advantage unlawful**

No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

**(c)    Schedules**

Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or

1205296v.1

sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

**(d)    Notice required for rate changes**

Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public.  Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect.  The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

**(e)    Suspension of new rates; hearings; five-month period**

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate,

1205296v.1

charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective.  If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified.  At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or

1205296v.1

charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

## Federal Power Act, Section 206(a)-(c), 16 U.S.C. 824e(a)-(c):

**(a)    Unjust or preferential rates, etc.; statement of reasons for changes; hearing; specification of issues**

Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, or classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order.  Any complaint or motion of the Commission to initiate a proceeding under this section shall state the change or changes to be made in the rate, charge, classification, rule, regulation, practice, or contract then in force, and the reasons for any proposed change or changes therein.  If, after review of any motion or complaint and answer, the Commission shall decide to hold a hearing, it shall fix by order the time and place of such hearing and shall specify the issues to be adjudicated.

- 68 -

**(b)    Refund effective date; preferential proceedings; statement of reasons for delay; burden of proof; scope of refund order; refund orders in cases of dilatory behavior; interest**

Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date.  In the case of a proceeding instituted on complaint, the refund effective date shall not be earlier than the date of the filing of such complaint nor later than 5 months after the filing of such complaint.  In the case of a proceeding instituted by the Commission on its own motion, the refund effective date shall not be earlier than the date of the publication by the Commission of notice of its intention to initiate such proceeding nor later than 5 months after the publication date.  Upon institution of a proceeding under this section, the Commission shall give to the decision of such proceeding the same preference as provided under section 824d of this title and otherwise act as speedily as possible.  If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision.  In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon the Commission or the complainant.  At the conclusion of any proceeding under this section, the Commission may order

1205296v.1

refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force:  *Provided,* That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission may order refunds of any and all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding.  The refunds shall be made, with interest, to those persons who have paid those rates or charges which are the subject of the proceeding.

**(c)     Refund considerations; shifting costs; reduction in revenues; "electric utility companies" and "registered holding company" defined**

Notwithstanding subsection (b) of this section, in a proceeding commenced under this section involving two or more electric utility companies of a registered holding company, refunds which might otherwise be payable under subsection (b) of this section shall not be ordered to the extent that such refunds would result from any portion of a Commission order that (1) requires a decrease in system production or transmission costs to be paid by one or more of such electric company; and (2) is

- 70 -

based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: *Provided,* That refunds, in whole or in part, may be ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric utility company of the holding company to recover such increase in costs for the period between the refund effective date and the effective date of the Commission's order.  For purposes of this subsection, the terms "electric utility companies" and "registered holding company" shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended [15 U.S.C.A. § 79 et seq.].

**Federal Power Act, Section 301, 16 U.S.C. 825:**

**(a)      Duty to keep.**

Every licensee and public utility shall make, keep, and preserve for such periods, such accounts, records of cost-accounting procedures, correspondence, memoranda, papers, books, and other records as the Commission may by rules and regulations prescribe as necessary or appropriate for purposes of the administration of this Act [16 USCS §§ 791a et seq.], including accounts, records, and memoranda of the generation, transmission, distribution, delivery, or sale of

1205296v.1

electric energy, the furnishing of services or facilities in connection therewith, and receipts and expenditures with respect to any of the foregoing: Provided, however, That nothing in this Act [16 USCS §§ 791a et seq.] shall relieve any public utility from keeping any accounts, memoranda, or records which such public utility may be required to keep by or under authority of the laws of any State. The Commission may prescribe a system of accounts to be kept by licensees and public utilities and may classify such licensees and public utilities and prescribe a system of accounts for each class. The Commission, after notice and opportunity for hearing, may determine by order the accounts in which particular outlays and receipts shall be entered, charged, or credited. The burden of proof to justify every accounting entry questioned by the Commission shall be on the person making, authorizing, or requiring such entry, and the Commission may suspend a charge or credit pending submission of satisfactory proof in support thereof.

**(b)     Access to and examination by the Commission.**

The Commission shall at all times have access to and the right to inspect and examine all accounts, records, and memoranda of licensees and public utilities, and it shall be the duty of such licensees and public utilities to furnish to the Commission, within such reasonable time as the Commission may order, any information with respect thereto which the Commission may by order require, including copies of maps, contracts, reports of engineers, and other data, records,

1205296v.1

and papers, and to grant to all agents of the Commission free access to its property and its accounts, records, and memoranda when requested so to do. No member, officer, or employee of the Commission shall divulge any fact or information which may come to his knowledge during the course of examination of books or other accounts, as hereinbefore provided, except insofar as he may be directed by the Commission or by a court.

**(c)    Controlling individual.**

The books, accounts, memoranda, and records of any person who controls, directly or indirectly, a licensee or public utility subject to the jurisdiction of the Commission, and of any other company controlled by such person, insofar as they relate to transactions with or the business of such licensee or public utility, shall be subject to examination on the order of the Commission.


**Federal Power Act, Section 302, 16 U.S.C. 825a:**

(a)    The Commission may, after hearing, require licensees and public utilities to carry a proper and adequate depreciation account in accordance with such rules, regulations, and forms of account as the Commission may prescribe. The Commission may, from time to time, ascertain and determine, and by order fix, the proper and adequate rates of depreciation of the several classes of property of each licensee and public utility. Each licensee and public utility shall conform its

1205296v.1

depreciation accounts to the rates so ascertained, determined, and fixed. The licensees and public utilities subject to the jurisdiction of the Commission shall not charge to operating expenses any depreciation charges on classes of property other than those prescribed by the Commission, or charge with respect to any class of property a percentage of depreciation other than that prescribed therefor by the Commission. No such licensee or public utility shall in any case include in any form under its operating or other expenses any depreciation or other charge or expenditure included elsewhere as a depreciation charge or otherwise under its operating or other expenses. Nothing in this section shall limit the power of a State commission to determine in the exercise of its jurisdiction, with respect to any public utility, the percentage rate of depreciation to be allowed, as to any class of property of such public utility, or the composite depreciation rate, for the purpose of determining rates or charges.

(b)    The Commission, before prescribing any rules or requirements as to accounts, records, or memoranda, or as to depreciation rates, shall notify each State commission having jurisdiction with respect to any public utility involved, and shall give reasonable opportunity to each such commission to present its views, and shall receive and consider such views and recommendations.

1205296v.1

**18 C.F.R. Pt. 101,** *Gen'l Instr. 22*

**22.  Depreciation Accounting.**

**A.     Method.** Utilities must use a method of depreciation that allocates in a systematic and rational manner the service value of depreciable property over the service life of the property.

**B.     Service lives.** Estimated useful service lives of depreciable property must be supported by engineering, economic, or other depreciation studies.

**C.     Rate.** Utilities must use percentage rates of depreciation that are based on a method of depreciation that allocates in a systematic and rational manner the service value of depreciable property to the service life of the property. Where composite depreciation rates are used, they should be based on the weighted average estimated useful service lives of the depreciable property comprising the composite group.

1205296v.1